**PHARMACIST POLITICAL ACTION COMMITTEE OF MARYLAND (PHARMPAC), Kitchin Drugs, Inc., Bennie Owens, Carroll P. Marinelli, Bernard C. McDougall, Q & B, Inc., and Ralph Quarles**

v.

**Patricia R. HARRIS,[1] Secretary of Health and Human Services, Charles R. Buck, Individually, and in his capacity as Secretary of Health and Mental Hygiene for the State of Maryland.**

Civ. No. HM79–845.

United States District Court, D. Maryland.

Dec. 1, 1980.

---

1. Patricia R. Harris succeeded Joseph A. Califano, Jr. as Secretary of Health and Human Services (itself the successor to the Department of Health, Education and Welfare as of May 4, 1980) and, pursuant to 42 U.S.C. § 405(g) (1976), the appropriate substitution has been made.

Harvey Greenberg, Greenberg, Ruther & Wenck, Baltimore, Md., for plaintiffs.

Russell T. Baker, Jr., U. S. Atty., for D. Maryland, Kurt L. Schmoke, Asst. U. S. Atty., for D. Maryland, Baltimore, Md., Sarah Wilcox, Atty., Dept. of Health and Human Services, Washington, D. C., for defendant Patricia R. Harris, Secretary of Health and Human Services.

Stephen H. Sachs, Atty. Gen. of Maryland, Randall M. Lutz and Stephen J. Sfekas, Asst. Attys. Gen. of Maryland, Baltimore, Md., for defendants Charles R. Buck, Individually, and in his capacity as Secretary of Health and Mental Hygiene for the State of Md.

HERBERT F. MURRAY, District Judge.

This is an action brought by the Pharmacist Political Action Committee of Maryland (PHARMPAC) challenging both the validity of the Maximum Allowable Cost (MAC) regulations of the Department of Health, Education and Welfare (HEW)[2] and the administration of the MAC program within and by the State of Maryland. PHARM-PAC is an unincorporated association of Maryland pharmacists who seek declaratory and injunctive relief against both defendants and who additionally seek damages from the State.

Plaintiffs' broad–based challenge to the MAC regulations encompasses the following grounds: (1) the MAC regulations are not authorized by statute; (2) the MAC regulations constitute an unconstitutional delegation of authority from the Congress to HEW; (3) the regulations amount to governmental control over medical and health care; (4) the regulations establish rate regulation and price–fixing of pharmaceutical products and services; (5) the regulations dissuade community pharmacists from participating in the Medical Assistance Program, thereby impeding access to health care and abetting the establishment of an inferior standard of health care; (6) the regulations deprive plaintiffs of the right to engage in their profession free from irrational governmental restrictions; (7) the amount of reimbursement authorized by the regulations is discriminatory against plaintiffs individually and as a class and amounts to a taking of property without just compensation; (8) the Medical Assistance Program is administered in a manner which violates plaintiffs' Constitutional and civil rights to due process and equal protection of the laws; (9) the regulations effectively determine drug product selection by pharmacists and physicians and discriminate against independently owned and operated community pharmacies, in violation of 42 U.S.C. § 1395's protection of the health and medical industries against (in plaintiff's characterization) restraints of trade and monopolies.[3]

The history of the MAC program is well recounted in an opinion by Judge Prentice H. Marshall in *American Medical Ass'n v. Mathews*, 429 F.Supp. 1179, 1185–87 (N.D. Ill.1977) and will only be highlighted here. The MAC regulations, codified at 45 C.F.R. § 19.1 *et seq.*, establish procedures for determining limitations on (a) reimbursement for drugs under the Medicaid and Medicare programs, (b) the amount which may be charged to Public Health Service projects for prescribed drugs, and (c) the amount of payment for drugs purchased directly by HEW. In general, payment or reimbursement for drugs shall not exceed the lowest of three possible computations: (1) the maximum allowable cost (MAC) of the drug, if any,[4] plus a reasonable dispensing fee; (2) the acquisition cost[5] of the drug plus a reasonable dispensing fee; or (3) the provider's[6] usual and customary charge to the public. 45 C.F.R. § 19.3(a).

---

**2.** At the time this suit was filed, this agency had not yet been redesignated as Health and Human Services. For the sake of consistency with the pleadings, the agency's former name will be used throughout this opinion.

**3.** 42 U.S.C. § 1395 actually provides as follows:

Nothing in this subchapter shall be construed to authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided, or over the selection, tenure, or compensation of any officer or employee of any institution, agency, or person providing health services, or to exercise any supervision or control over the administration or operation of any such institution, agency, or person.

**4.** The procedures by which a MAC limit is set on a particular product are well set out in *American Medical Association v. Mathews*, 429 F.Supp. 1179, 1186 (N.D.Ill.1977) [hereinafter cited as *AMA v. Mathews* or *Mathews*].

**5.** "Acquisition cost" is defined as "the price generally and currently paid by providers for a drug marketed or sold by a particular formulator or labeler in the package size of the drug most frequently purchased by providers." 45 C.F.R. § 19.2(f).

**6.** A "provider" is "one who furnishes medical or pharmaceutical services or supplies for which he is entitled to reimbursement or payment under an eligible health program." *Id.* § 19.2(e).

The first computation alternative (MAC) applies only to multiple–source drugs[7] for which a maximum allowable cost has been set in accordance with the procedures specified in 45 C.F.R. § 19.5, the idea being to permit HEW, like any other consumer, to take advantage of price variations resulting from the interaction of market forces whenever that agency purchases or reimburses for drugs. In essence, HEW has determined that it will purchase lower priced pharmaceutical products–without compromising the quality of health care to those receiving these products–whenever different companies market bioequivalent[8] drugs at significantly different prices.

Both defendants have moved to dismiss the complaint, albeit on markedly different grounds. After due deliberation, the court has concluded that the objections to the complaint are sound; for the reasons that follow, the motions to dismiss will be granted.

## I. JURISDICTION

■ A preliminary matter as to this court's jurisdiction needs to be clarified. It is quite true, as argued by the State of Maryland, that 28 U.S.C. §§ 1343(3) and 1343(4) do not provide a basis for federal jurisdiction in this case. The Supreme Court has already decided that the Social Security Act is not a statute securing "equal rights" within the meaning of § 1343(3) or "civil rights" within the meaning of § 1343(4). *Chapman v. Houston Welfare Rights Organization*, 441 U.S. 600, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979). It is also true that the Second Circuit has determined that the Social Security Act is not an "Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies" within the mean-

ing of 28 U.S.C. § 1337. *Almenares v. Wyman*, 453 F.2d 1075, 1082 n.9 (2d Cir. 1971), *cert. denied*, 405 U.S. 944, 92 S.Ct. 962, 30 L.Ed.2d 815 (1972). But the court need not rely on these jurisdictional bases, as plaintiffs have also predicated their lawsuit on the general federal question provision, 28 U.S.C. § 1331, and the court finds this assertion of jurisdiction adequate.

■ To be sure, the individual plaintiffs may not aggregate their individual claims in order to attain the $10,000 jurisdictional minimum, but to justify a dismissal on this ground, it must appear to a legal certainty that the claim is really for less than the jurisdictional amount, or that the plaintiffs individually never were entitled to recover such an amount. *Horton v. Liberty Mutual Insurance Co.*, 367 U.S. 348, 353, 81 S.Ct. 1570, 1573, 6 L.Ed.2d 890 (1961); *Hales v. Winn–Dixie Stores, Inc.*, 500 F.2d 836 (4th Cir. 1974). The court views the complaint as containing allegations of continuing damage, and monetary liability which will accrue in the future may properly be counted against the jurisdictional amount if "a right to future payments ... will be adjudged in the present suit." 1 J. Moore, Federal Practice ¶ 0.93[5.–3]. *See Weinberger v. Wiesenfeld*, 420 U.S. 636, 642 n.10, 95 S.Ct. 1225, 1230 n.10, 43 L.Ed.2d 514 (1975); *Broglie v. Mac Kay–Smith*, 541 F.2d 453 (4th Cir. 1976). If the plaintiffs were to prevail, such a right to future payments would exist, so the minimum amount in controversy requirement of § 1331 is satisfied.

## II. STANDING

■ Pharmpac is an organizational plaintiff and therefore, absent any allegations of injury to the organization itself, can have

---

**7.** "Multiple–source drug" is defined as "a drug marketed or sold by two or more formulators or labelers of a drug marketed or sold by the same formulator or labeler under two or more proprietary names or both under a proprietary name and without such a name." 45 C.F.R. § 19.2(d).

**8.** Drug products are chemically equivalent when they contain the same amount of the

same active ingredient in the same dosage form. Two chemically equivalent drug products from different manufacturers are said to be *bioequivalent* if the comparative rates and extent of absorption of the drugs into the human body are so similar that the products can be interchanged without an unacceptable change in therapeutic effect.

standing only as a representative of members who themselves have standing to bring the suit in their own right. *See Simon v. Eastern Ky. Welfare Rights Organization,* 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976); *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

■ To the extent that plaintiffs seek to assert a *jus tertii* to effective and quality health care, *e. g.,* Amended Complaint ¶ 12, their claims must be dismissed for lack of standing. Under *Association of Data Processing Service Organizations v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), a two–pronged test for determining standing must be satisfied: (1) "injury in fact, economic or otherwise," and (2) "whether the interest sought to be protected by this complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Id.* at 154, 90 S.Ct. at 830. Pharmpac cannot pass this test, for even if it could establish some kind of injury to itself or its members resulting from the purveying of lower quality health care to Medicaid recipients, it would be unable to fit within the zone of interests sought to be protected by the statutes in question.

The same analysis applies to claims that the MAC regulations amount to control over medical and health care. The standing inquiry focuses not on whether the claim is justiciable but on whether this or that individual is a proper plaintiff—one with a sufficiently concrete interest in the outcome to litigate the matter to the fullest, a concern central to the Art. III case or controversy requirement of the Constitution. The question of whether the regulatory scheme at bar constitutes undue intrusion into the practice of medicine is best litigated by those who practice medicine—namely physicians—and in fact has already been brought by the American Medical Association in *AMA v. Mathews, supra* ; Pharmpac has no standing to raise such a claim.

In short, the court finds that plaintiffs lack standing to raise those issues numbered (3), (5) and (9) *ante* at page 1238, *supra.*

## III. FAILURE TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED

■ For purposes of a motion under Fed. R.Civ.P. 12(b)(6), the factual allegations of the complaint are taken as true and only the sufficiency of the claim as a matter of law is tested. *Walker Process Equip. v. Food Mach. & Chem. Corp.,* 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965). The court will deal with the remaining issues raised by plaintiffs (*i. e.* those issues not dismissed for lack of standing) *seriatim.*

(a) *Whether the MAC regulations are authorized by statute*

■ General authority for the Secretary to promulgate such regulations as may be necessary to administer the programs legislated by Congress in the Social Security Act is found in 42 U.S.C. § 1302. In *AMA v. Mathews, supra,* plaintiffs argued that the MAC regulations exceeded the Secretary's authority and violated the reimbursement standards provided in the Act, but the court found in § 1302 ample statutory authorization for enactment by the Secretary of any regulation "reasonably related to the purposes of the Act and consistent with the enabling legislation." 429 F.Supp. at 1191, *citing Johnson's Professional Nursing Home v. Weinberger,* 490 F.2d 841, 844 (5th Cir. 1974). The court then went on to canvas the various reimbursement standards in the Act, 429 F.Supp. at 1192, and concluded that the "reasonable cost" standard of § 1395x(v)(1)(A) "is most immediately relevant ... and most clearly embodies the Congressional formula for preventing reimbursement for excessively priced medical items and services." *Id.* at 1195–96. Judge Marshall's examination of the legislative history revealed that § 1395x(v)(1)(A) was intended "to cover more than merely the problem of the spendthrift" and "that the precipitating stimulus for the enactment of § 1395x(v)(1)(A) was a desire to establish limits on difference in provider costs which flowed from marked inefficiency in operation or conditions of excessive service." *Id.*

at 1199. The actual holding in *Mathews* was that "the MAC regulations themselves constitute the methodology contemplated by § 1395(v)(1)(A)." *Id.* at 1198.

Additional authorization for the MAC regulations has been found in 42 U.S.C. §§ 1395u(b)(3) and 1396b(i)(1), which are respectively the Medicare and Medicaid provisions limiting payment on certain items to the lowest charge levels at which a service or supply is widely and consistently available. *Hoffman–Laroche v. Califano*, 453 F.Supp. 900, 903 (D.D.C.1978).

This court is persuaded by the above authorities and will dismiss this part of plaintiffs' complaint as meritless.

(b) *Delegation of legislative authority*

For over forty years, the federal courts have upheld those delegations of power by the Congress which have not resulted in encroachment upon constitutionally protected private rights.[9] Under the necessary and proper clause of Article I, § 8, any enumerated power "implies a power [to delegate] authority under it sufficient to effect its purposes." *Lichter v. United States*, 334 U.S. 742, 778, 68 S.Ct. 1294, 1313, 92 L.Ed. 1694 (1948). "Delegation by Congress has long been recognized as necessary in order that the exertion of legislative power does not become a futility." *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 398, 60 S.Ct. 907, 914, 84 L.Ed. 1263 (1940). So long as Congress has provided some standards for the agency's guidance, the courts do not and should not invoke the delegation doctrine to interpose their judgment for that of the agency.

Courts may properly seek to promote the purposes of formal justice by demanding more complete articulation of the grounds for agency action, whether accomplished through rulemaking or adjudication, and should police the agencies' choice between rulemaking and adjudication for abuse of discretion. But the notion that judges can and should attempt to "locate the optimum degree of structuring in each respect for each discretionary power" is unrealistic and unwise. Since judges would often lack the facts or experience necessary to ascertain the extent of agency ability to specify policy in greater detail, such a standard would largely turn on subjective judgments, and would pose a debilitating threat to agency programs which could chill needed policy initiatives.

Stewart, *The Reformation of American Administrative Law*, 88 Harv.L.Rev. 1667, 1700–1701 (1975).

In *Hampton & Co. v. United States*, 276 U.S. 394, 48 S.Ct. 348, 72 L.Ed. 624 (1928), the Supreme Court sustained the constitutionality of the Tariff Act of 1922, which authorized the imposition of customs duties on imported articles, the amount of the duty being the difference between the cost of production in a foreign country and selling them in the United States versus the cost of producing and selling like or similar articles in the United States. The legislation provided for the investigation and determination of these differences by a Tariff Commission which reported to the President, who would then increase or decrease the duty. The Court, per Mr. Chief Justice Taft, said, "If Congress shall lay down by legislative act an intelligible principle to which the person or body authorized to fix such rates is directed to conform, such legislative action is not a delegation of legislative power." *Id.* at 409, 48 S.Ct. at 352.

Despite the call by several distinguished commentators for resurrection of the somewhat moribund delegation doctrine, *see* J. Skelly Wright, *Beyond Discretionary Justice*, 81 Yale L.J. 575 (1972); Schotland, *After 25 Years: We Come to Praise the APA and Not to Bury It*, 24 Ad.L.Rev. 261 (1972); Koslow, *Standardless Administrative Adjudication*, 22 Ad.L.Rev. 407 (1970), the stream of federal court decisions since the time of *Schechter Poultry Corp. v. Unit-*

---

**9.** *See United States v. Robel*, 389 U.S. 258, 275–79, 88 S.Ct. 419, 429–32, 19 L.Ed.2d 508 (1967) (Brennan, J. concurring); *Zemel v. Rusk*, 381 U.S. 1, 21, 85 S.Ct. 1271, 1283, 14 L.Ed.2d 179 (1965) (Black, J. dissenting); *Watkins v. United States*, 354 U.S. 178, 205, 77 S.Ct. 1173, 1188, 1 L.Ed.2d 1273 (1957).

*ed States,* 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935) and *Panama Refining Co. v. Ryan,* 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935) has eviscerated the argument advanced by the plaintiffs herein. The state of the law has been aptly summarized in a recent treatise:

> [F]ederal courts can and do deal with the problem of delegated authority as one of statutory interpretation and avoid gratuitous constitutional holdings against delegation–even if the limits on the Congressional grant of delegated authority must be found implicit in the objectives of the law or in other statutory and constitutional policies rather than explicit in anything occurring during the legislative process.

H. Linde & G. Bunn, Legislative and Administrative Processes 537 (1975).

The MAC regulations were issued with the benefit of explicit statutory standards: 42 U.S.C. §§ 1395u(b)(3) and 1396b(i)(1) authorize the Secretary to pay no more for certain items than the lowest charge levels at which these supplies and services are widely and consistently available. *See* 45 C.F.R. § 19.5(c), which incorporates this exact language. Furthermore, as pointed out by the court in *Mathews,* 42 U.S.C. § 1395x(v)(1)(A) provides a statutory definition of "reasonable cost" as "the cost actually incurred, excluding therefrom any part of the incurred cost found [by the Secretary] to be unnecessary in the efficient delivery of needed health services." 429 F.Supp. at 1193. On the basis of all these considerations, the Secretary's authority to adopt the MAC regulations must be upheld.

### (c) *Rate Regulation and Price–Fixing*

Some industries, such as public utilities, are natural monopolies. As a result, the Congress has found it necessary, from time to time, to impose rate regulation on various industries in order to accomplish various purposes, among which is providing the public with the benefit of a rate comparable to what would have been the product of free market competition, if such competition had been possible. This type of regula-

tion, which would be branded as price–fixing and a *per se* violation of the antitrust laws were it to be done by private parties, is what plaintiffs charge the government with accomplishing by the adoption of the MAC regulations.

In contrast, what the MAC program attempts to do, as noted at page 1238, *supra,* is to place the government in a position whereby it can benefit from the free play of market forces by taking advantage of variations in price. A regulated industry, by definition, would not permit such variations, but would be a situation where one governmentally fixed price was the rule and the exceptions being available only on an *ad hoc* basis from the regulating agency. The MAC regulations do not force pharmacists to sell at a specified price; they merely limit the amount the government will pay when it purchases or reimburses for drugs.

As most state Medicare programs cover only drugs furnished to patients in hospitals and nursing homes, or administered in a doctor's office, the primary impact of the MAC program is on outpatient medications covered by the state Medicaid program. No pharmacist is forced to sell drugs at a set price: he is free to charge whatever he pleases, but if his prices are high in comparison with his competitors, he may lose his Medicaid customers. This is no different from any other free market influence on price.

Finally, it should be emphasized that participation by pharmacists in the State Medicaid program is entirely voluntary. If the plaintiffs deem the prices paid for a drug by the Medicaid agency to be inadequate, they need not participate in the program. Presumably, if enough pharmacists feel as plaintiffs do, the price for the drugs in question will go up until an adequate level is reached. All the government will do is pay the most favorable price, whatever that price might be.

### (d) *Deprivation of Liberty and Property without Due Process of Law*

Plaintiffs allege in paragraph 26 of the Amended Complaint:

The promulgation and administration of the MAC Regulations by the Federal Defendant and the State Defendant ... effectively regulate and limit the exercise of independent judgment in pharmaceutical product selection which constitutes a deprivation of the Plaintiffs' right to engage in their profession in a lawful manner free from government restrictions that have no reasonable relationship to any valid legislative purpose.

 It can easily be seen from the court's prior description of the MAC program and regulations that the above claim is without merit. The most that can be said about the MAC program is that it might diminish an individual pharmacist's profit margin with respect to Medicaid drugs, but sales to non-Medicaid customers may be at any price that the market will bear. Again, it should be noted that participation in the program is entirely voluntary. Therefore, because the court deems it unlikely that plaintiffs could establish a protected interest in retaining a particular share of the Medicaid market, regardless of the prices they see fit to charge for the drugs in question, there can be no liberty interest infringed here.

Similarly, no taking of property without just compensation has occurred on this record. There is no compulsion to participate in the program. To say that the very existence of the MAC regulations has decreased plaintiffs' business because the regulations discourage inefficient management, superfluous service, and excessive drug prices obviously fails to state a cognizable claim.

The Medicaid program, Title XIX of the Social Security Act, is after all a cooperative federal–state venture, under which the federal government provides matching funds to states with qualified medical assistance programs. Although the states are given broad latitude in formulating these programs, the Act prescribes certain minimum requirements with which all states must comply. In particular, the Act does not permit states to reimburse those who provide medical services in excess of "reasonable charges consistent with efficiency, economy, and quality of care." 42 U.S.C. § 1396a(30). The MAC regulations were promulgated in accordance with this mandate. The regulations do not, however, compel pharmacists to sell at a loss or forego anything other than the ability to collect a charge which the Secretary deems excessive, and, as noted earlier, if the individual pharmacist disagrees with the Secretary's determination, he can cease participating in the program.

 Naturally, all determinations of what is a reasonable price give rise to the potential of arbitrary agency action, for which the Administrative Procedure Act provides a remedy. 5 U.S.C. § 706(2)(A). However, the courts are loath to substitute their judgment for that of the agency, *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), and if the regulations are "reasonably related to the purpose of the enabling legislation," the courts ordinarily will not set them aside. *Mourning v. Family Publications Service, Inc.*, 411 U.S. 356, 369, 93 S.Ct. 1652, 1660, 36 L.Ed.2d 318 (1973); *Thorpe v. Housing Authority*, 393 U.S. 268, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969). In this connection, it should be noted that the MAC regulations do provide a number of guidelines to be used in setting the dispensing fee, 42 C.F.R. § 447.333, and the amount of the fee may vary depending upon the circumstance, e. g., whether the drug is prescription or non–prescription, or is furnished to an individual or to an institution. *Id.*, §§ 447.-333(b)(3) and (c). The court therefore concludes that the mechanism for setting fees is not arbitrary or capricious and that the regulations are not confiscatory.

(e) *Equal Protection of the Laws*

 In the area of social welfare legislation, the Supreme Court has held that a classification is not necessarily violative of the equal protection clause simply because "it is not made with mathematical nicety or because in practice it results in some inequality." *Dandridge v. Williams*, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970). So long as the classification is ra-

tional, it will be sustained against an equal protection challenge. *Jefferson v. Hackney*, 406 U.S. 535, 546, 92 S.Ct. 1724, 1731, 32 L.Ed.2d 285 (1972).

 This court has already concluded that the MAC regulations are a rational means to ensure that the government will not have to pay excessively high prices for drugs provided under federal health programs. Plaintiffs cannot demonstrate that pharmacists should be classified differently for this purpose than physicians. As for the argument that the regulations result in a *de facto* discrimination against small pharmacies because of their proportionally higher overhead per prescription than larger concerns, it should be noted that the regulations take this into account by authorizing the State to vary the dispensing fee according to the size of the pharmacy. 42 C.F.R. § 447.333(b)(1). Therefore no equal protection violation is made out by the facts alleged in the complaint.

## IV. HEALTH CARE AND THE MAC REGULATIONS

A final word is in order about the effect of the MAC regulations on the quality of health care received by the needy. Implicit in the allegations just discussed and explicit in those which plaintiffs have no standing to bring is the claim that the MAC regulations dissuade doctors and pharmacists from using certain drugs, bring pressure to bear on the exercise of their professional judgment, and result in a diminution of the quality of health care provided to Medicaid recipients.

The fundamental premise of the MAC program is that many brand name drugs are extravagant substitutes for lower—priced, "generic" drugs. To make sure that this is the case with respect to any set of products, the regulations provide that, as part of the process for setting the MAC on any drug, the Food and Drug Administration must provide written certification of the bioequivalence of the products in question. 45 C.F.R. § 19.5(b). Notwithstanding this built-in protection, the regulations provide further that "the MAC established for

any drug shall not apply to a brand of drug prescribed for a patient which the prescriber has certified in his own handwriting is medically necessary for that patient." *Id.*, § 19.3(a)(3). Thus, a physician is always free to override the MAC limitation if, in his professional judgment, a particular brand is necessary. That this decision is to be made by the physician and not the pharmacist merely reflects the common practice, *i. e.* that it is the physician who *prescribes* the medication and the pharmacist who *dispenses* it.

Furthermore, if perchance the MAC program has the effect of introducing financial considerations into the physician's decision concerning the course of treatment to recommend to his patients, then Congress will have achieved its purpose. As noted in the opinion in *AMA v. Mathews, supra*:

> By enacting a strengthened cost limitation section (§ 1395x(v)(1)(A)) and authorizing the Secretary to exercise extensive cost control powers, Congress struck a balance between cost controls and professional independence. This balance is not upset by the incidental effects predicted by plaintiffs. The legislative history of § 1395x(v)(1)(A) demonstrates that Congress wanted the judgmental process in the health care delivery system to be influenced and animated by a consciousness of the costs of medical care:
>
>> Health care institutions, like other entities in our economy should be encouraged to perform efficiently and when they fail to do so should suffer the consequences.... The committee believes that [these] objectives can only be accomplished by reimbursement mechanisms that limit reimbursement to the costs that would be incurred by a reasonably prudent and cost–conscious management. S.Rep.No. 92–1230, [92d Cong., 2d Sess. 187 (1972)].
>
> In short, Congress did not intend to shield the medical decision–making process from financial consequences. If the MAC regulations have the effect of altering present drug prescription habits in the medical profession to reflect greater cost

efficiency, that effect is consistent with Congressional intent.

429 F.Supp. at 1202.

For the foregoing reasons, the court will grant motions to dismiss filed by the Federal and State defendants. Defense counsel should submit an appropriate order within ten days.