**MEDICAL ARTS PHARMACY OF STAMFORD, INC., et al., Plaintiffs,**

**v.**

**BLUE CROSS & BLUE SHIELD OF CONNECTICUT, INC., Defendant.**

**Civ. No. B–79–77.**

United States District Court, D. Connecticut.

July 21, 1981.

Kenneth D. Wallace, Stamford, Conn., for plaintiffs.

H. Kennedy Hudner, Lissa J. Paris, John C. Yavis, Jr., Francis J. Brady, Murtha, Cullina, Richter & Pinney, Hartford, Conn., for defendants.

## RULING ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

EGINTON, District Judge.

In *Group Life & Health Insurance Co. v. Royal Drug Co.*, 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979), the Supreme Court held that certain provider agreements entered into between an insurer and a large number of licensed pharmacies were not exempt from examination under the antitrust laws. The basis of the Court's holding was that these agreements did not constitute the "business of insurance" within the

meaning of § 2(b) of the McCarran-Ferguson Act, 15 U.S.C. § 1012(b). The Court specifically did not consider whether the agreements in fact violated the antitrust laws. *Id.* at 210 & n.5, 99 S.Ct. at 1072 & n.5. The instant case presents this court with an opportunity to address that question: that is, whether provider agreements entered into between plaintiffs, a class consisting of approximately 650 licensed pharmacies in the State of Connecticut, and defendant Blue Cross & Blue Shield of Connecticut, Inc. ("Blue Cross") are illegal under the antitrust laws.

I

Blue Cross is a Connecticut nonprofit, nonstock corporation which, among other things, offers various service benefit contracts to its subscribers. Since 1967 Blue Cross has maintained a prescription drug program under which subscribers can obtain prescription drugs from licensed pharmacies at little or no cost to the subscriber other than the premium payment.

The prescription drug program operates through the use of two distinct types of contracts. The first contract, between Blue Cross and its individual subscribers (the "subscriber contract"), determines the level of benefits for each insured. The second contract, entitled the "Prepaid Prescription Drug Agreement by and between Blue Cross & Blue Shield of Connecticut, Inc. and Participating Pharmacy" (the "pharmacy agreement"), sets forth the terms under which a participating pharmacy will provide prescription drugs to Blue Cross' subscribers.

Under the subscriber contract, a subscriber may obtain prescription drugs from either a participating or nonparticipating pharmacy. If the subscriber selects the former, he will receive the needed drug with no out-of-pocket expense, or in a minority of subscriber contracts, at a fee of $.75 (the "co-pay" amount). Blue Cross then reimburses the pharmacy at the rate set in the pharmacy agreement. If, on the other hand, the subscriber selects a nonparticipating pharmacy, he is required to pay the full price charged by the pharmacy. The subscriber may then obtain reimbursement from Blue Cross, although the amount of reimbursement cannot exceed the amount Blue Cross would reimburse a participating pharmacy under the pharmacy agreement.[1] From 1975 through 1979 approximately 9% of Connecticut's population was eligible for Blue Cross prescription drug benefits. Blue Cross estimates that it accounted for approximately 9% of the prescription drug sales in Connecticut over that same period.

Under the pharmacy agreement, a participating pharmacy agrees to furnish prescription drugs to Blue Cross subscribers at no cost or at $.75 if the co-pay is applicable, and Blue Cross agrees to reimburse the pharmacy at the rates set in the pharmacy agreement. Blue Cross instituted this contract unilaterally and offered all pharmacies in Connecticut the opportunity to participate; currently all but two participate.

Prior to September 1, 1977, Blue Cross reimbursed participating pharmacies by paying them their "actual acquisition cost" ("AAC") of each drug dispensed to a Blue Cross subscriber plus a professional fee to provide for their overhead and profit. Blue Cross relied on a pharmacy's supply invoices to validate its AAC. This reimbursement method caused difficulties because Blue Cross found that it could not accurately verify a pharmacy's AAC. Although the pharmacy agreement obligated pharmacies to pass on to Blue Cross the various discounts they received from their wholesalers and manufacturers when purchasing drugs,

1. Since June 1, 1980, the subscriber contract has specified that all payments for purchases from nonparticipating pharmacies would be at 100% of the reimbursement level to participating pharmacies. Prior to that date, the reimbursement level had been set at 80%. That differential arose for two reasons. First, when it initiated the program in 1967, Blue Cross could not precisely determine the actuarial cost of the new program nor the actual number of participating pharmacies. To limit its underwriting risk, it set the 80% figure, a standard insurance company practice. Second, the figure acted as an incentive to pharmacies to participate.

many pharmacies apparently did not. Often, a pharmacy's invoices from its suppliers did not reflect discounts, free goods, or rebates. Consequently, the appropriate reductions to the pharmacy's AAC could not be discovered readily in an audit.

In September, 1977, Blue Cross switched to the "maximum billable amount" ("MBA") method of reimbursement. This method differed from the prior AAC method in that Blue Cross determined ceiling amounts for the drug element of its reimbursement rates. That is, Blue Cross placed a limit on how much it was willing to pay for any given drug. The MBA concept was designed to produce payments to pharmacies approximately equivalent to an average pharmacy's AAC, and at the same time presumably reduce Blue Cross' underwriting and administrative burdens.[2] Blue Cross continued to pay participating pharmacies a set professional fee to provide for overhead and profit.[3]

The MBA reimbursement levels are established in one of two ways: the most frequently dispensed drugs that may be purchased directly from manufacturers are reimbursed according to Blue-Cross formulated lists;[4] all other drugs are reimbursed according to "Red Book" average wholesale price ("AWP") rates.[5]

## II

Plaintiff Medical Arts Pharmacy filed this action in March, 1979, less than one week after the Supreme Court's decision in *Group Life & Health Insurance Co. v. Royal Drug Co., supra.* The complaint charges that the pharmacy agreements are an illegal price-fixing arrangement within the proscriptions of section 1 of the Sherman Act, 15 U.S.C. § 1. It also alleges violations of the Connecticut Unfair Trade Practices Act, Conn.Gen.Stat. §§ 42–110a *et seq.*

Shortly after commencement of the suit, Medical Arts Pharmacy moved for class certification. After limited class-related discovery and thorough briefing, this court, pursuant to Fed.R.Civ.P. 23(b)(3), certified a class comprising licensed pharmacies in the State of Connecticut, who had, on or before June 30, 1980, entered into a pharmacy agreement with Blue Cross.

The action is presently before the court on cross-motions for summary judgment. The gist of plaintiffs' motion is that the pharmacy agreements fix prices for prescription drugs, and, as such, are *per se* illegal under section 1 of the Sherman Act. Defendant quite naturally denies that the pharmacy agreements are a *per se* section 1 violation and, through its cross-motion, asserts that even under a rule of reason analysis the agreements do not violate the antitrust laws.[6]

2. Under this plan, participating pharmacies are entitled to receive the MBA even where that amount exceeds a pharmacy's AAC. Blue Cross contends, however, and plaintiffs do not contest this point, that there is still substantial variability in the prices charged to Blue Cross by participating pharmacies. For example, affidavits submitted by Blue Cross indicate that plaintiff Medical Arts Pharmacy billed approximately 20% of its prescriptions for the period 1977-79 at prices lower than the MBA.

3. Since September 1, 1980 the professional fee has been $3.05. In establishing this fee, Blue Cross considers such factors as pharmaceutical industry data, professional fees paid under similar third-party plans, and other general economic indicators.

4. Blue Cross issues three separate price lists which are appended to the pharmacy agreement. These appendix prices are based on the cost of the drug as though purchased directly from the manufacturer. Blue Cross issues separate appendices to account for the difference in the purchasing power among large, intermediate-size, and smaller pharmacies. Monthly, Blue Cross adjusts the price it will pay for drugs listed on one or more of the appendices based on changes in the prices manufacturers charge for the drugs.

5. The Red Book is a trade journal published semiannually by Medical Economics Co. It contains average wholesale and/or wholesale prices for all drugs. These published AWP prices are based on the price a wholesaler charges to pharmacies. This price may go up or down as often as twice monthly. Blue Cross monitors the change through a trade magazine supplement to the Red Book called Drug Topics.

6. Blue Cross also maintains that its activities are insulated from antitrust scrutiny by the "state action" doctrine first enunciated in *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87

## III

Before proceeding directly to a discussion of the legal claims raised by these motions, it should be noted that the same issues raised here were recently considered by District Judge Peckham in *Sausalito Pharmacy, Inc. v. Blue Shield of California*, [1980–81] Trade Cas. 77,722 (N.D.Cal. May 12, 1980) ("*Sausalito I*") and *Sausalito Pharmacy, Inc. v. Blue Shield of California*, [1981–1] Trade Cas. 75,604 (N.D.Cal. Mar. 16, 1981), *appeal docketed*, No. 81–4198 (9th Cir. Apr. 17, 1981) ("*Sausalito II*").

*Sausalito I & II* involved a section 1 challenge by a group of participating pharmacies against a number of insurance companies and plan administrators who underwrite and administer prescription drug plans substantially similar to the one at issue here. In *Sausalito I*, plaintiffs moved for summary judgment on the issue of liability, arguing that the pharmacy agreements were *per se* illegal under the Sherman Act. The court denied the motion, principally on the ground that the pharmacy agreements were "arrangements for the purchase of goods and services" and, hence, did not constitute a form of "price-fixing" that was *per se* unlawful. *Sausalito I* at 77,724 *quoting* *Group Life & Health Insurance Co. v. Royal Drug Co., supra*, 440 U.S. at 214, 99 S.Ct. at 1074. In so ruling, the court stated that the relative novelty of these arrangements also counselled against "precipitous" invocation of the *per se* rule. *Sausalito I* at 77,724.

In *Sausalito II*, defendants moved for summary judgment, contending that even under a rule of reason analysis there was no basis for antitrust liability. The court agreed and granted the motion, holding that while a variety of approaches could be taken in analyzing the pharmacy agreements under the rule of reason, "[n]o matter which [is taken] . . . the conclusion that

the agreements do not violate the rule of reason is inescapable." *Sausalito II* at 75,-607.[7] This court concurs generally with Judge Peckham's rulings in *Sausalito I & II*. However, in the absence of precedent in this district and circuit, the court believes it important to issue its own opinion as to the matters raised herein.

## IV

■ Section 1 of the Sherman Act prohibits every contract, combination, or conspiracy in restraint of trade. A section 1 plaintiff must establish both elements: first, that defendant entered into a contract, combination or conspiracy; and second, that such was in restraint of trade. *Oreck Corp. v. Whirlpool Corp.*, 639 F.2d 75, 78 (2d Cir. 1980).

■ Blue Cross' initial argument that plaintiffs have failed to show a contract, combination, or conspiracy need not long detain the court. Its somewhat disingenuous attempt to characterize the pharmacy agreements as unilateral activity cannot survive even the most superficial analysis. While it may be true that Blue Cross made a unilateral offer about which it refused to bargain, it is undisputed that Blue Cross and each of the plaintiffs have entered into a *bilateral* contract which establishes the requisite section 1 joint action. The question, therefore, is not whether there is a contract within the purview of section 1, but whether that contract restrains trade.

■ Although the Sherman Act speaks of restraint of trade in absolute terms, it has long been established that section 1 proscribes only unreasonable restraints. *Standard Oil Co. v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). Not surprisingly, therefore, the "rule of reason" has evolved as the basic test for determin-

---

L.Ed. 315 (1943). While there is considerable force to the contentions of Blue Cross that such immunity may be available, this court need not reach the issue in view of its holding that Blue Cross' activities do not give rise to antitrust liability.

7. Plaintiffs' assertion that reimbursement in *Sausalito I & II* was based on AAC rather than AWP is clearly contradicted by Judge Peckham's statement that the reimbursement level for the drug component "is determined by reference to average wholesale prices." *Sausalito I* at 77,723; *Sausalito II* at 75,605.

ing the legality of a business practice which purportedly operates to restrain trade. Under this rule, the court is required to analyze "the challenged restraint's impact on competitive conditions." *National Society of Professional Engineers v. United States,* 435 U.S. 679, 688, 98 S.Ct. 1355, 1363, 55 L.Ed.2d 637 (1978). Certain business relationships are deemed unreasonable *per se,* however, "because of their pernicious effect on competition and lack of any redeeming virtue." *Northern Pacific Railway Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). This *per se* rule stands as a form of antitrust analysis complementary to the rule of reason and is directed to those relationships "whose nature and necessary effect are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality—they are 'illegal *per se.*'" *National Society of Professional Engineers v. United States, supra,* 435 U.S., at 692, 98 S.Ct. at 1365.

 It is well-established that certain types of agreements to fix prices are unlawful *per se.* *See, e. g., Catalano, Inc. v. Target Sales, Inc.,* 446 U.S. 643, 100 S.Ct. 1925, 64 L.Ed.2d 580 (1980) (*per curiam*) (horizontal agreement among competitors); *United States v. Parke, Davis & Co.,* 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960) (vertical agreement between suppliers and customers). Yet, not every agreement that has an impact on price, either vertically or horizontally, is a *per se* violation of the Sherman Act. *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.,* 441 U.S. 1, 23, 99 S.Ct. 1551, 1564, 60 L.Ed.2d 1 (1979). For example, a contract for the sale of goods "fixes" the price at which the goods are to be sold, but such a contract is not *per se* illegal, absent a showing of some adverse impact on competition. *Cf. United States v. Topco Associates Inc.,* 405 U.S. 596, 606, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972); *Chicago Board of Trade v. United*

*States,* 246 U.S. 231, 238, 38 S.Ct. 242, 243, 62 L.Ed. 683 (1918). The proper inquiry, thus, is not whether a particular agreement literally fixes a price, but whether the agreement is so "plainly anticompetitive" and so very likely without "redeeming virtue" that a court will apply the label "*per se* price fixing." *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc., supra,* 441 U.S., at 8–9, 99 S.Ct. at 1556–1557.

█ Plaintiffs contend that the pharmacy agreements are a form of horizontal price-fixing and, hence, *per se* unlawful. This characterization completely ignores the relationship of the parties. Blue Cross is neither a seller in competition with retail pharmacies, nor a manufacturer or wholesaler in competition with suppliers of pharmaceuticals. Rather, as discussed at length in *Group Life & Health Insurance Co. v. Royal Drug Co., supra,* Blue Cross buys prescription drug products for their insureds. There has been no showing, indeed, no claim, that Blue Cross has conspired with other third-party payors who offer comparable prescription drug plans. Plaintiffs' suggestion that Blue Cross has somehow facilitated an unlawful horizontal conspiracy among participating pharmacies is similarly unpersuasive. The question, for purposes of a horizontal analysis, is whether Blue Cross has conspired with *its* competitors to restrain trade. The answer is that it clearly has not.

█ Plaintiffs assert alternatively that the agreements are *per se* illegal as a form of maximum resale price maintenance. *See Albrecht v. Herald Co.,* 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968); *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.,* 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951). This argument, though facially more plausible, is nonetheless unavailing. Even assuming *Albrecht* and *Kiefer-Stewart* can be read in the expansive manner suggested by plaintiffs,[8] the pharmacy

---

**8.** The *Albrecht* and *Kiefer-Stewart* holdings have been widely criticized and their continued vitality is in question. *See* Kallstrom, *Health Care Cost Control by Third Party Payors: Fee Schedules and the Sherman Act,* 1978 Duke

L.J. 645, 665–68; *cf. Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977) (nonprice vertical restraints analyzed under the rule of reason). *But see Yentsch v. Texaco, Inc.,* 630 F.2d 46,

agreements differ in several important respects from the typical agreement between a manufacturer and a distributor establishing resale prices; most significantly, under the pharmacy agreements, there is no resale of anything. *Cf. Sausalito II* at 75,607 n.1. The only price that is established by the pharmacy agreement is the price that Blue Cross will pay participating pharmacies for prescribed drugs. "The price-fixing within the scope of the *per se* prohibition of § 1, however, is an agreement to fix the price to be charged in transactions with third parties, not between the contracting parties themselves." *Sitkin Smelting & Refining Co. v. FMC Corp.*, 575 F.2d 440, 446 (3d Cir.), *cert. denied*, 439 U.S. 866, 99 S.Ct. 191, 58 L.Ed.2d 176 (1978). *Accord Sausalito II* at 75,607; *Blue Cross & Blue Shield of Michigan v. Michigan Association of Psychotherapy Clinics*, [1980–2] Trade Cas. 75,-792, 75,794 (E.D.Mich. Mar. 14, 1980).

■ Other than their attempts to characterize the pharmacy agreements as horizontal price-fixing or as a form of maximum resale price maintenance, plaintiffs do not seriously contend that these agreements fall within any of the traditionally recognized *per se* categories. Rather, plaintiffs proceed on a far more literal tack and baldly assert that because the pharmacy agreements have an impact on price, they are necessarily unlawful *per se*. As has already been noted, however, this view misapprehends the proper scope of the *per se* rule. *See Broadcast Music, Inc. v. Columbia Broadcasting System, Inc., supra*. Invocation of the *per se* rule is justified only when a court concludes that the restraint is "plainly anticompetitive" and lacking "any redeeming virtue." This court is not prepared to so find on the record now before it.

■ The court's conclusion that the pharmacy agreements are not *per se* unlawful is fortified by the Supreme Court's oft-repeated admonition that "[i]t is only after considerable experience with certain business relationships that courts classify them as *per se* violations...." *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc., supra*, 441 U.S., at 9, 99 S.Ct., at 1557, *quoting United States v. Topco Associates, Inc., supra*, 405 U.S., at 607–08, 92 S.Ct. at 1133. When a court is uncertain of the competitive significance of a particular restraint, it must decline to apply the *per se* label. *See Continental T.V., Inc. v. GTE Sylvania Inc., supra; White Motor Co. v. United States*, 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963). The pharmacy agreement is admittedly novel; it has been subject to only limited antitrust scrutiny by the courts. *See Sausalito I & II*. Moreover, the agreement arises in the health care field, an industry that courts and commentators alike have recognized "does not respond to classic marketplace forces." *National Gerimedical Hospital & Gerontology Center v. Blue Cross of Kansas City*, —— U.S. ——, ——, 101 S.Ct. 2415, 2422, 69 L.Ed.2d 89 (1981), *quoting* S.Rep. No. 93–1285 at 39 (1974), U.S.Code Cong. & Admin. News 1974, 7842; *see Arizona v. Maricopa County Medical Society, supra*, at 556; Halper, *The Health Care Industry and the Antitrust Laws: Collision Course?*, 49 Antitrust L.J. 17 (1980). As such, "it would be unduly precipitous to apply the *per se* rule invoked in judging practices 'which because of their pernicious effect on competition and lack of [any] redeeming virtue are conclusively presumed to be unreasonable.'" *Sausalito I* at 77,724, *quoting Northern Pacific Railway Co. v. United States, supra*.

■ The court now considers the pharmacy agreements under the rule of reason. "Under this rule, the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Continental T.V., Inc. v. GTE Sylvania Inc., supra*, 433 U.S., at 49, 97 S.Ct. at 2557 (footnote omitted). Some of the circumstances to be analyzed

51 52 (2d Cir. 1980). The Supreme Court's recent grant of certiorari in *Arizona v. Maricopa County Medical Society*, 643 F.2d 553 (9th Cir. 1980), *cert. granted*, —— U.S. ——, 101 S.Ct. 1512, 67 L.Ed.2d 813 (1981), may give the Supreme Court an opportunity to reexamine the issue of maximum restraints.

include "the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed." *National Society of Professional Engineers v. United States, supra*, 435 U.S., at 692, 98 S.Ct., at 1365. The essence of this rule is a consideration of the restraint on competition. That is, "the inquiry . . . is directed at the challenged restraint's overall impact on competitive conditions, rather than whether a particular party has been restrained by the conduct at issue." *Berman Enterprises Inc. v. Local 333, United Marine Division, International Longshoremen's Association*, 644 F.2d 930, 937 (2d Cir. 1981). This distinction is of special significance in the present case.

■ The gravamen of plaintiffs' complaint is that Blue Cross, through the pharmacy agreements, pays participating pharmacies less than cash and carry customers (i. e., nonsubscribers).[9] This, they claim, deprives them of their "normal and reasonable" profit margins. The same theme pervades the motion papers. The complaint does not set forth any specific claims of impact on competition, an essential element of a section 1 claim under a rule of reason analysis. For example, no claim has been made, or even suggested, that the prices Blue Cross pays to participating pharmacies affect prices in any other transaction. That is, there is no claim that the pharmacy agreements affect the prices participating pharmacies charge for prescription drugs provided to non-Blue Cross customers, or

the price nonparticipating pharmacies charge to anyone. Similarly, there is no claim that the reimbursement rates set in the agreements affect the prices charged by pharmacies for their non-drug merchandise.

Plaintiffs have pleaded impact on competition only in the most conclusory terms. The sole allegation is that the pharmacy agreements have "fix[ed] the retail price of and, establish[ed] a market-wide fee schedule for" prescription drugs, and that those prices are "unremunerative." While these allegations may satisfy the liberal pleading requirements of Fed.R.Civ.P. 8, they are not sufficient standing alone to oppose a properly supported motion for summary judgment. In opposing summary judgment, a plaintiff may not rest on its pleadings, but must submit some probative evidence in support of its complaint. Fed.R.Civ.P. 56(e); *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968); *Nifty Foods Corp. v. Great Atlantic & Pacific Tea Co.*, 614 F.2d 832 (2d Cir. 1980). Here defendants have presented evidence contradicting the allegations of plaintiffs' complaint. Plaintiffs have not responded in kind to demonstrate "a genuine issue for trial" as required by Rule 56(e).

■ Plaintiffs do oppose defendant's motion for summary judgment, but merely by stating that there are "substantial questions of fact." None of these questions of

---

9. To the extent plaintiffs' complaint can be read to allege coercion, that claim was specifically disavowed by plaintiffs during the pendency of the class certification motion. In any event, there is a significant question in the court's mind whether a claim of coercion can stand on the facts of this case. *Cf. Travelers Insurance Co. v. Blue Cross of Western Pennsylvania*, 481 F.2d 80, 84 (3d Cir.), *cert. denied*, 414 U.S. 1093, 94 S.Ct. 724, 38 L.Ed.2d 550 (1973). *Nationwide Mutual Insurance Co. v. Automotive Service Councils of Delaware, Inc.*, [1981–1] Trade Cas. 75,960 (D.Del. Apr. 10, 1981). *See also* Note, *Prepaid Prescription Drug Plans under Antitrust Scrutiny: A Stern Challenge to Health Care Cost Containment*, 75 Nw.L.Rev. 506, 528–31 (1980).

Similarly, plaintiffs' conclusory claim of a "buyer conspiracy," *see Quality Auto Body, Inc. v. Allstate Insurance Co.*, [1980–2] Trade

Cas. 76,691 (N.D.Ill. Aug. 19, 1980), must also fail. The authorities cited by plaintiffs, *see, e. g., Mandeville Island Farms, Inc. v. American Crystal Sugar Co.*, 334 U.S. 219, 68 S.Ct. 996, 92 L.Ed. 1328 (1948), are readily distinguishable: all involved horizontal agreements by buyers with monopsony power. In this case, plaintiffs have not shown, much less alleged, that defendant has dominant buying power in the market. Plaintiffs do not even contest defendant's assertion that its market share over the last five years has averaged less than 10%. Moreover, to establish a "buyer conspiracy", plaintiffs must show not only monopsony power, but something more than the mere existence of a group of buyers. *Cf. Michelman v. Clark-Schwebel Fiber Glass Corp.*, 534 F.2d 1036, 1043 (2d Cir.), *cert. denied*, 429 U.S. 885, 97 S.Ct. 236, 50 L.Ed.2d 166 (1976). They have not done so here.

"fact" are material to defendant's motion. First, plaintiffs contend that defendant is not a "purchaser." This is not a question of fact; it is a question of law for the court. This court specifically finds that defendant is a purchaser. *See Group Life & Health Insurance Co. v. Royal Drug Co., supra,* 440 U.S., at 214, 224, & 229, 99 S.Ct., at 1074, 1079, & 1082; *Sausalito II* at 75,606. Second, plaintiffs argue that there is a "possibility of defendant's having conspired with others." This unsupported and conclusory allegation raised for the first time in response to defendant's cross-motion and plainly outside the scope of the pleadings is not sufficient to withstand summary judgment. Plaintiffs' third claim that "other issues of fact are probable" is similarly deficient.

The Supreme Court has counselled that summary judgment in antitrust litigation should be used sparingly. *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). This is particularly true in a rule of reason case where a court must assess impact on competitive conditions. The question of whether a restraint promotes or suppresses competition, *see National Society of Professional Engineers v. United States, supra,* 435 U.S., at 691, 98 S.Ct., at 1365, is not one that can typically be resolved through summary proceedings. Rather, resolution must await a fully-developed trial record. Such a searching examination is not warranted, however, on the pleadings of this case because plaintiffs have placed all their eggs in the *per se* basket. Although the complaint can be read to encompass a claim that the

pharmacy agreements would fail even under a rule of reason analysis, that claim has plainly not been pursued in these summary judgment proceedings.

Unquestionably Blue Cross has established itself as a strong force in the prescription drug market in Connecticut and elsewhere. It cannot, however, be penalized for using its position in the market, as it has here, to "get the best deal possible" for its subscribers absent some showing of anticompetitive conduct. *Travelers Insurance Co. v. Blue Cross of Western Pennsylvania, supra,* at 84. Here, there is no substantial claim that the pharmacy agreements have any adverse impact on competitive conditions. To the contrary, the only substantial claim is that plaintiffs themselves have been restrained in the amount of reimbursement they receive for dispensing prescription drugs to Blue Cross subscribers. "The failure to make more money, however, is simply not the kind of problem which the antitrust laws address." *Sausalito II* at 75,608. Thus, plaintiffs' claims, even if proved, do not state a claim for relief under the antitrust laws. To hold otherwise would be to disregard the well-established principle that "the antitrust laws ... were enacted for 'the protection of *competition* not *competitors....*'" *Oreck Corp. v. Whirlpool Corp.,* 579 F.2d 126, 134 (2d Cir.) (en banc), *cert. denied,* 439 U.S. 946 (1978), *quoting Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977) (emphasis in original). As such, defendant's motion for summary judgment on count 1 of the complaint is granted.[10]

---

10. Although the court does not reach the substantive issue of whether in fact the pharmacy agreements would survive a rule of reason analysis or even if such a conclusion is possible on summary judgment, it notes that other courts have considered provider agreements similar to the one *sub judice* and reached such a conclusion. *See, e. g., Webster County Memorial Hospital, Inc. v. United Mine Workers,* 536 F.2d 419 (D.C.Cir.1976); *Nationwide Mutual Insurance Co. v. Automotive Service Councils of Delaware, Inc., supra; Proctor v. State Farm Mutual Automobile Insurance Co.,* [1980–81] Trade Cas. 77,138 (D.D.C. Oct. 23, 1980); *Quality Auto Body, Inc. v. Allstate Insurance*

*Co., supra; Blue Cross & Blue Shield of Michigan v. Michigan Association of Psychotherapy Clinics, supra; Chick's Auto Body v. State Farm Mutual Automobile Insurance Co.,* 401 A.2d 722, 168 N.J.Super. 68 (1979). *See also Arkansas Pharmacists Association v. Harris,* 627 F.2d 867 (8th Cir. 1980); *Pharmacist Political Action Committee v. Harris,* 502 F.Supp. 1235 [1980–81] (D.Md.1980).

Similarly, on several occasions, the Justice Department has reviewed prescription drug plans substantially similar to the one at issue here and each time concluded that they did not pose antitrust problems. *See* Kallstrom, *Health Care Cost Control by Third Party Payors: Fee*

## V

■ Count two of the complaint alleges violations of the Connecticut Unfair Trade Practices Act, Conn.Gen.Stat. §§ 42–110a *et seq.* Jurisdiction for those claims arises solely because they are pendent to the federal antitrust claims. Having granted defendant's motion for summary judgment with respect to count one of the complaint, the court hereby dismisses count two because plaintiffs have made no showing of exceptional circumstances which would warrant the court exercising its pendent jurisdiction. *See Kavit v. A. L. Stamm & Co.,* 491 F.2d 1176 (2d Cir. 1974).

Accordingly, plaintiffs' motion for summary judgment is denied, defendant's cross-motion for summary judgment is granted with respect to count one of the complaint, and count two of the complaint is dismissed.

It is So Ordered.

*Schedules and the Sherman Act, supra,* at 672–73. In its amicus curiae brief in *Group Life & Health Insurance Co. v. Royal Drug Co.,* the Justice Department stated the following:

> As a general matter . . . antitrust principles would not preclude the offering of prepaid health insurance programs that use insurer-provider agreements. For example, the pleadings in this case indicate that the Pharmacy Agreements are bilateral contracts for the purchase of goods and services by Blue Shield. Blue Shield has offered to purchase drugs and pharmacy services from any pharmacy that will accept acquisition cost plus $2.00. Unless respondents could establish that some conspiracy among pharmacies is at work the Pharmacy Agreements would not amount to "price fixing." Transactions at a set price, through a series of voluntary bilateral contracts, are not price fixing even though large numbers of sellers of services may be involved.

Brief for the United States as Amicus Curiae, at 10–11 (citations omitted), *Group Life & Health Insurance Co. v. Royal Drug Co., supra.*