**MEDICAL ARTS PHARMACY OF STAMFORD, INC., et al.,
Plaintiffs-Appellants,**

v.

**BLUE CROSS & BLUE SHIELD OF CONNECTICUT, INC.,
Defendant-Appellee.**

**No. 517, Docket 81–7671.**

United States Court of Appeals,
Second Circuit.

Argued Feb. 3, 1982.
Decided April 1, 1982.

Kenneth D. Wallace, Stamford, Conn., for plaintiffs-appellants.

John C. Yavis, Jr., Hartford, Conn. (H. Kennedy Hudner, Lissa J. Paris, Murtha, Cullina, Richter & Pinney, Hartford, Conn., of counsel), for defendant-appellee.

Shereen Edelson, Hartford, Conn. (R. Cornelius Danaher, Jr., Tamara Kagan Weiner, Danaher, Lewis & Tamoney, Hartford, Conn., of counsel), for amicus curiae Connecticut Pharmaceutical Ass'n.

Before LUMBARD, OAKES and VAN GRAAFEILAND, Circuit Judges.

PER CURIAM:

Plaintiff Medical Arts Pharmacy of Stamford, Inc. ("Medical Arts"), on behalf of itself and a class of approximately 650 Connecticut retail pharmacies, appeals from a judgment of the United States District Court for the District of Connecticut, Warren W. Eginton, *Judge*, denying its motion for summary judgment on its claim that defendant Blue Cross & Blue Shield, Inc. ("Blue Cross") violated section 1 of the Sherman Act, 15 U.S.C. § 1, and granting Blue Cross's cross-motion for summary judgment. We affirm.

## FACTS

The following facts of this case, which are set forth more fully in the thorough and well-reasoned opinion below, 518 F.Supp. 1100 (D.Conn.1981), are undisputed. Under Blue Cross's prescription-drug program, subscribers, representing approximately 9% of Connecticut's population, can obtain prescription drugs from licensed pharmacies at little or no cost beyond the prepayment of premiums. A contract between Blue Cross and its individual subscribers (the "subscriber contract") determines the level of benefits for each insured, and a second contract, entitled the "Prepaid Prescription Drug Agreement by and between Blue Cross & Blue Shield of Connecticut, Inc. and Participating Pharmacy" (the "pharmacy agreement"), sets forth the terms under which a participating pharmacy will provide prescription drugs to Blue Cross's subscribers.

The subscriber contract permits the insured to obtain prescription drugs from either a participating or a nonparticipating pharmacy. If the subscriber purchases the drugs from a nonparticipating pharmacy, he pays the full price charged by the pharmacy and then obtains reimbursement from Blue Cross in an amount no greater than that which Blue Cross would reimburse a participating pharmacy.[1] If, on the other hand, a subscriber selects a participating pharmacy, he generally receives the needed drug at no out-of-pocket expense.[2] Blue Cross then reimburses the pharmacy at a rate established in the pharmacy agreement.

The pharmacy agreement, which Blue Cross unilaterally instituted and offered to all Connecticut pharmacies, provides for a "maximum billable amount" method of reimbursement. Blue Cross determines the maximum it will reimburse participating pharmacies for any drug by reference either to Blue Cross's own separate price lists

---

1. Prior to June 1, 1980, the reimbursement level was set at only 80% of the reimbursement to participating pharmacies.

2. In a minority of subscriber contracts, the insured receives the needed drug at a fee of 75 cents (the "co-pay" amount). Where the co-pay is applicable, participating pharmacies agree to furnish prescription drugs to Blue Cross subscribers for 75 cents; otherwise the drugs are furnished at no cost to subscribers.

or, in the case of infrequently dispensed drugs, by reference to "Red Book" average wholesale price rates. Participating pharmacies are also paid a predetermined professional fee to provide for overhead and profit. All but two Connecticut pharmacies participate in Blue Cross's prescription drug program.

Medical Arts charged in its complaint that the pharmacy agreements are price-fixing arrangements proscribed by section 1 of the Sherman Act, 15 U.S.C. § 1. On its motion for summary judgment Medical Arts asserted that because the agreements fix prices for prescription drugs, they are *per se* illegal under section 1. Blue Cross asserted in its cross-motion that even under a rule of reason analysis the agreements did not violate the Sherman Act. The district court denied Medical Arts' motion, holding the *per se* rule of illegality inapplicable to the Blue Cross pharmacy agreements, and granted the cross-motion for summary judgment upon a finding that Medical Arts' pleadings had failed to allege the anticompetitive effect necessary to hold the pharmacy agreements impermissible under a rule of reason analysis.[3]

## DISCUSSION

### I. *Medical Arts Motion for Summary Judgment*

■ Section 1 of the Sherman Act makes unlawful "[e]very contract, combination . . ., or conspiracy, in restraint of trade or commerce among the several States. . . ." 15 U.S.C. § 1. *Per se* rules of illegality under section 1 are applicable only to restrictive agreements that are "manifestly anticompetitive," *Connecticut T. V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49–50, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977); *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). *See also Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 649, 100

S.Ct. 1925, 1928, 64 L.Ed.2d 580 (1980) ("when a particular concerted activity entails an obvious risk of anticompetitive impact with no apparent potentially redeeming value, the fact that a practice may turn out to be harmless in a particular set of circumstances will not prevent its being declared unlawful *per se* "). Otherwise, challenged conduct must be analyzed under the rule of reason, which requires the factfinder to determine whether, under all of the circumstances of the case, including the facts peculiar to the business and the history of, reasons for, and market impact of the restraint, the restrictive practice imposes an unreasonable restraint on competition. *See National Society of Professional Engineers v. United States*, 435 U.S. 679, 687–92, 98 S.Ct. 1355, 1363–65, 55 L.Ed.2d 637 (1978).

■ Medical Arts urges application of a *per se* rule of illegality, arguing that the pharmacy agreements, which establish the maximum price Blue Cross will pay participating pharmacies for prescription drugs, are analogous to the maximum price restraints struck down in *Albrecht v. Herald Co.*, 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968) (publisher's establishment of maximum resale price of newspapers sold by carriers held *per se* violation of section 1), and *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.*, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951) (distillers' agreement on maximum resale price of liquor sold by distributors held *per se* violation of section 1). *Cf. United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223, 60 S.Ct. 811, 844, 84 L.Ed. 1129 (1940) ("a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal *per se* "). The Supreme Court left open this question in *Group Life & Health Insurance Co. v. Royal Drug Co.*, 440 U.S. 205, 210 & n.5, 99 S.Ct. 1067, 1072 & n.5, 59 L.Ed.2d 261 (1979), which held that similar insurer-

---

**3.** Medical Arts also claimed that the pharmacy agreements violated the Connecticut Unfair Trade Practices Act, Conn.Gen.Stat. §§ 42–110a *et seq*. Medical Arts does not appeal from the district court's dismissal of the pen-

dent claim upon its finding that, after granting summary judgment in favor of Blue Cross with respect to the claim under section 1 of the Sherman Act, the court lacked jurisdiction over the claim arising solely under Connecticut law.

pharmacy agreements were not exempt from examination under the antitrust laws.

The district court properly declined to apply the *per se* rule. Rejecting Medical Arts' argument that the pharmacy agreements were comparable to maximum resale price maintenance or to horizontal price fixing, the court held that Blue Cross was the purchaser of the prescribed drugs, and therefore its establishment of the maximum price it would pay participating pharmacies for the drugs was not price fixing within the scope of the *per se* prohibition of section 1. 518 F.Supp. at 1107 (citing *Sitkin Smelting & Refining Co. v. FMC Corp.*, 575 F.2d 440, 446 (3d Cir.), *cert. denied*, 439 U.S. 866, 99 S.Ct. 191, 58 L.Ed.2d 176 (1978) (the *per se* rule applies to "an agreement to fix the price to be charged in transactions with third parties, not between the contracting parties themselves")). As the Supreme Court observed in *Group Life & Health Insurance Co. v. Royal Drug Co.*, 440 U.S. at 214, 99 S.Ct. at 1074, "[t]he Pharmacy Agreements . . . are merely arrangements for the purchase of goods and services by Blue Shield." *See also* Note, *Prepaid Prescription Drug Plans Under Antitrust Scrutiny: A Stern Challenge to Health Care Cost Containment*, 75 Nw.L.Rev. 506, 513–14 (1980) ("The insurers are simply *buyers* who *partially* reimburse the pharmacies for each sale of a prescription drug. In effect, the pharmacies make one sale to a two-sided buyer composed of the insurer and the subscriber") (emphasis in original).

Medical Arts asserts that only the subscriber is the purchaser of prescription drugs under the Blue Cross program, and cites in support of its argument various provisions of the Uniform Commercial Code which we do not consider relevant to deciding the antitrust issue. But even if Blue Cross cannot be characterized as the purchaser for the purposes of antitrust analysis, we consider the pharmacy agreements to be sufficiently different from the maximum price-fixing agreements struck down in *Albrecht* and *Kiefer-Stewart* to preclude application of the *per se* rule. In *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979), the Supreme Court declined to apply the *per se* rule against price-fixing to Broadcast Music's decision to market its inventory of copyrighted musical compositions only in the form of blanket licensing agreements and to charge a single price for its entire musical inventory regardless of actual usage. Emphasizing that not all "price fixing" as such is "plainly anticompetitive," *id.* at 9, 99 S.Ct. at 1556, the Court analyzed the general commercial background of this arrangement before concluding that it was not a naked restraint on competition, *id.* at 20, 99 S.Ct. at 1562, but rather was ancillary to the integration of sales promotion and of copyright enforcement, which in fact contributed to competition and efficiency, *id.* at 20–23, 99 S.Ct. at 1562–64. *See also United States v. Topco Associates, Inc.*, 405 U.S. 596, 607–08, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972) ("It is only after considerable experience with certain business relationships that courts classify them as *per se* violations of the Sherman Act"); *Copy-Data Systems, Inc. v. Toshiba America, Inc.*, 663 F.2d 405, 411 (2nd Cir. 1981) (*per se* rule should not be lightly applied to business relationships with potential for enhancing competition). We agree with the courts and commentaries that have found that, like the price-fixing practice upheld in *Broadcast Music, Inc.*, Blue Cross pharmacy agreements are novel restraints with potential procompetitive effects, and therefore must be analyzed under the rule of reason. *See, e.g., Sausilito Pharmacy, Inc. v. Blue Shield of California*, [1980–81] Trade Cas. ¶ 63,695 at 77,724–25 (N.D.Cal. May 12, 1980); Note, *supra*, 75 Nw.L.Rev. at 518–26. *See also* Kallstrom, *Health Care Cost Control by Third Party Payors: Fee Schedules and the Sherman Act*, 1978 Duke L.J. 645, 668 (distinguishing insurer agreements with health-care providers from resale price maintenance).

Whether Blue Cross is characterized as a purchaser or simply as an indemnitor or third-party payor, it is the ultimate payor, and therefore its prescription drug plan differs significantly from the vertical arrangements to restrict resale prices that were

invalidated in *Albrecht* and *Kiefer-Stewart.* *See Albrecht*, 390 U.S. at 151, 88 S.Ct. at 872 ("*resale* price fixing is a *per se* violation") (emphasis added). Nor is the plan a horizontal agreement among competitors to set prices[4] as involved in *Arizona v. Maricopa County Medical Society*, 643 F.2d 553 (9th Cir. 1980) (setting of maximum fees that physician members of foundations for medical care (FMC) could claim in full payment for health services provided to policyholders of FMC-approved insurance plans held not illegal *per se* under the Sherman Act), *cert. granted*, 450 U.S. 979, 101 S.Ct. 1512, 67 L.Ed.2d 813 (1981). In addition, unlike the resale price maintenance agreements in *Albrecht* and *Kiefer-Stewart*, which were arguably injurious to competition, *see generally* L. A. Sullivan, *Antitrust* 377–87 (1977); *but see* Easterbrook, *Maximum Price Fixing*, 48 U.Chi.L.Rev. 886 (1981), it has been argued that prepaid drug insurance plans potentially promote competition and efficiency, for example by countering the normal insensitivity of drug prices, *see* Note, *supra*, 75 Nw.L.Rev. at 518–25. Pharmacy agreements are ancillary to the otherwise valid commercial efforts of Blue Cross to design the most efficient insurance coverage for subscribers, *see* Kallstrom, *supra*, 1978 Duke L.J. at 659–65. *Cf. Broadcast Music, Inc.*, 441 U.S. at 20, 99 S.Ct. at 1562.

█ In short, the challenged conduct by Blue Cross is not governed by *Albrecht* and *Kiefer-Stewart*, but is *sui generis*. Although the pharmacy agreements do fix prices, and are not precisely between seller and purchaser (but between seller and indemnitor), they are not manifestly anticompetitive. Nor do we find that the pharmacy

agreements at issue here "on [their] face [have] the effect, or could have been spurred by the purpose, of restraining competition among the individual [pharmacies]." *Broadcast Music, Inc.*, 441 U.S. at 13, 99 S.Ct. at 1559.

## II. *Blue Cross's Cross-Motion for Summary Judgment*

As we have noted above, the analysis of a restrictive practice under the rule of reason focuses on whether the practice imposes an "unreasonable restraint on competition." *See Continental T. V., Inc. v. GTE Sylvania Inc.*, 433 U.S. at 49, 97 S.Ct. at 2557. Medical Arts' complaint, which charged in part that Blue Cross "has established a scheme which has coercively resulted in contracts and combinations fixing the retail price of and, establishing a market-wide fee schedule for a substantial portion of commerce in drugs and creating anticompetitive practices," may be read to challenge the pharmacy agreements under a rule of reason analysis. But the district court found that Medical Arts failed to pursue that claim in the summary judgment proceedings, and instead "placed all [its] eggs in the *per se* basket." 518 F.Supp. at 1109.

We agree after closely examining all of Medical Arts' various pleadings, affidavits, exhibits, and other submissions, *see* Fed.R. Civ.P. 56(c), (e), that Medical Arts failed to indicate a "genuine issue of material fact" with respect to the competitive impact of the pharmacy agreements. Medical Arts presented no facts to support its conclusory allegations of a "buyer conspiracy" and of a "possibility of defendant's having conspired with others," and Blue Cross presented evidence to contradict these allegations. Nor

---

**4.** Spokesmen for the Justice Department have distinguished between price agreements among pharmacists, which would be illegal horizontal price fixing, and agreements in which a third party such as an insurer unilaterally sets uniform drug-service fees and pharmacists decide individually whether to participate, which would be considered lawful. *See* Address by Lewis Bernstein, Chief of the Special Litigation Section of the Antitrust Division of the United States Department of Justice, before the Annual Convention of Retail Druggists, in Las Vegas, Nevada, Oct. 15, 1969, *reprinted as* Antitrust Aspects of Prepaid Prescription Plans (mimeo), *cited in* Kallstrom, *supra*, 1978 Duke L.J. at 670 n.99; *Hearings on H.R. 5 & 19 Before the Subcomm. on Environmental Problems Affecting Small Business of the House Select Comm. on Small Business*, 92nd Cong., 1st Sess. 231 (1971); Business Review Letters from the Justice Department cited at [1973] Antitrust and Trade Reg.Rep. (BNA) No. 619, at A-7, and [1975] Antitrust and Trade Reg. Rep. (BNA) No. 744, at A-14.

did appellants specify any negative impact on competition. As the district court noted, 518 F.Supp. at 1108, Medical Arts made no claim that the prices Blue Cross pays to participating pharmacies in any way affect the prices those pharmacies charge for prescription drugs provided to non-Blue Cross customers, the prices they charge for non-drug items, or any prices charged by non-participating pharmacies. And appellants nowhere made any claim that Blue Cross's market share of less than 10% of the drug purchasers' market gave Blue Cross monopsony power with which it might be capable of obtaining agreements with anticompetitive effect.

Appellants do raise the claim that by in effect requiring participating pharmacies in some instances to charge Blue Cross less than they would charge cash-and-carry customers for prescription drugs, the pharmacy agreements lower the participating pharmacies' profit margins. A low profit margin on sales to Blue Cross subscribers could not, however, establish an antitrust violation under the rule of reason. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962) (the antitrust laws were enacted for "the protection of *competition,* not *competitors* ") (emphasis in original); *Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126, 133–34 (2d Cir. 1978) (*en banc*).

Medical Arts and the Connecticut Pharmaceutical Association as amicus curiae now argue that such unsettled factual issues as the amount of reimbursement to a subscriber using a nonparticipating pharmacy, the method by which reimbursement amounts are determined, and the extent to which the fee schedules established by Blue Cross apply to the market place, are material to the issue of impact on competition. But nowhere in its pleadings or other submissions, either in the district court or on appeal, did Medical Arts relate these issues to a claim of anti-competitive impact. Despite the general inadvisability of deciding antitrust claims by summary judgment, *see Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962), particularly in cases of novel antitrust claims, *see White Motor Co. v. United States*, 372 U.S. 253, 261–64, 83 S.Ct. 696, 700–02, 9 L.Ed.2d 738 (1963), we agree that summary judgment was proper here in light of Medical Arts' failure to set forth specific facts which, if found in its favor, could establish that the pharmacy agreements imposed an unreasonable restraint on competition among pharmacies. *See* Fed.R.Civ.P. 56(e); *Nifty Foods Corp. v. Great Atlantic & Pacific Tea Co.*, 614 F.2d 832, 842 (2d Cir. 1980).

Judgment affirmed.