**GLEN EDEN HOSPITAL, INC.,**
**Plaintiff,**

v.

**BLUE CROSS AND BLUE SHIELD OF MICHIGAN, Defendant.**

**Civ. A. No. 80–72117.**

United States District Court,
E.D. Michigan, S.D.

Jan. 21, 1983.

338

Robins, Zelle, Larson & Kaplan by James R. Safley, Deborah J. Palmer and Rita A. McConnell, Minneapolis, Minn., Gropman, Kaplan, Sims & Gibbons, P.C. by Jerome C. Gropman and Dennis A. Peppler, Southfield, Mich., for plaintiff.

Kaye, Scholer, Fierman, Hays & Handler by Joshua F. Greenberg, Richard C. Seltzer, Daniel D. Chazin and Steven Glickstein, New York City, Michael B. Doelle and Michael T. Zajac, Blue Cross and Blue Shield of Michigan, Detroit, Mich., for defendant.

## OPINION

GILMORE, District Judge.

This is an action by plaintiff alleging that defendant Blue Cross has engaged in anticompetitive activities in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. § 1 and § 2. The complaint also includes two pendent state claims alleging a violation of the Michigan Antitrust Law and breach of contract.

Defendant has moved for summary judgment on all counts. For the reasons given below, the motion for summary judgment is granted.

### I

Defendant Blue Cross and Blue Shield ("Blue Cross") provides health benefits to individuals ("subscribers") by contracting with hospitals ("providers"). The providers agree to furnish health care services to subscribers in return for direct reimbursement paid by defendant. Hospitals that enter into such contracts are "participating hospitals" and the contract between the provider

and Blue Cross is called the "Participating Hospital Agreement." Under this agreement, hospitals are reimbursed for all their reasonable costs, plus an additional 2%. This reimbursement formula has been in effect since 1948.

Plaintiff Glen Eden is a private for-profit psychiatric hospital. Until 1973, Michigan law prohibited Blue Cross from entering into participation agreements with for-profit hospitals such as Glen Eden.[1]

In 1967, Blue Cross created a special reimbursement mechanism for profit-making hospitals by offering an addendum to its subscriber hospitalization contracts. This addendum, known as the "Non-Participating Psychiatric Hospital" ("NPPH") Rider, provided that, if a subscriber was admitted to a for-profit psychiatric hospital, Blue Cross would pay the hospital's reasonable and customary charge, not to exceed the average per diem payment to participating hospitals.

On December 5, 1969, Glen Eden entered into a contract with Blue Cross, pursuant to the NPPH rider, agreeing to furnish psychiatric care to subscribers covered by the rider in exchange for Blue Cross's agreement to reimburse it for its reasonable and customary charges. The payments to Glen Eden could not exceed the average per diem payment to hospitals operating under the Participating Hospital Agreement. The agreement also provided that either party could terminate the contract on 30 days' notice.

In February 1979, Blue Cross informed Glen Eden that it was terminating the 1969 contract and that Glen Eden could apply for participating hospital status. In its letter of termination, Blue Cross stated that it was terminating the contract because the amended state law would now allow Glen Eden to become a participating hospital, although it did not explain why it waited six years after the state law was amended to change the contract.[2]

1. Mich.Comp.Laws Ann. § 550.503 (1967), *as amended by* 1973 Mich.Pub.Acts 75, *repealed by* 1980 Mich.Pub.Acts 351, *codified at* Mich. Comp.Laws Ann § 550.1703.

2. See footnote 1, *supra.*

Glen Eden thereupon filed a suit in Michigan Circuit Court alleging breach of contract. This suit was settled, and by its terms the settlement agreement operated as Glen Eden's application for participating hospital status. The agreement further provided for an interim period of reimbursement which was to extend until June 30, 1980, unless Glen Eden's application as a participating hospital was accepted earlier. Although Blue Cross accepted Glen Eden as a participating hospital on March 26, 1980, Glen Eden refused to sign the Participating Hospital Agreement.[3]

On June 10, 1980, plaintiff commenced this lawsuit alleging that defendant had engaged in a conspiracy to restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and had conspired to monopolize, attempted to monopolize, and engaged in the unlawful exercise of monopoly power in violation of § 2 of the Sherman Act, 15 U.S.C. § 2.

Count I of the complaint alleges that defendant, acting in concert with co-conspirator hospitals,[4] established and maintained a non-competitive reimbursement mechanism, and used coercion and threats of boycott or refusals to deal to force plaintiff (and other hospitals) to accept the reimbursement system. Plaintiff claims that Blue Cross unlawfully refused to deal with it by terminating the 1969 contract and refusing reimbursement unless it accepted the Participating Hospital Agreement. Plaintiff also alleges that an unlawful refusal to deal was manifested by defendant's refusal to reimburse plaintiff on an experimental basis or to permit plaintiff to have access to defendant's computer. The final contention is that there was an unlawful refusal to deal when defendant declined to approve plaintiff's proposed new facility located in Troy, Michigan.

Count II of the complaint alleges that defendant has attempted and conspired to monopolize, and does monopolize, the health care industry in Michigan in violation of Section 2 of the Sherman Act. Here plaintiff claims that defendant has abused this monopoly power and attempted to acquire monopoly power by engaging in refusals to deal, boycotts, and by fixing a non-competitive reimbursement scheme. It is also claimed that defendant has prevented expansion of competing hospitals.

Count III alleges that, as a result of all the above-mentioned activity, defendant has restrained trade in violation of the Michigan anti-trust law, M.C.L.A. § 445.-701. Count IV alleges that defendant breached the 1969 contract by failing to properly reimburse plaintiff while that contract remained in effect.

The matter is before the Court upon defendant's motion for summary judgment on all counts. Defendant contends that there is no violation of Section 1 because plaintiff cannot prove the existence of the requisite conspiracy and because there was never any boycott or refusal to deal. Defendant also argues that there can be no Section 2 violation because Blue Cross is not a monopoly and because Blue Cross did not unlawfully exercise or attempt to acquire monopoly power. If Counts I and II are dismissed, Counts III and IV must fall because they are pendent state claims.

II

Section 1 of the Sherman Act prohibits every contract, combination, or conspiracy in restraint of trade. To establish a violation of Section 1, plaintiff must show that there was some kind of concerted action and that this action restrained trade. Defendant contends that plaintiff has not and cannot produce any evidence of a conspiracy of any kind.

---

**3.** The Court notes here that Glen Eden signed the Participating Hospital Agreement on October 31, 1980, after this Court denied plaintiff's motion for a preliminary injunction. Thus, Glen Eden has been and presently is operating under the "cost plus 2%" reimbursement formula that is applied to all participating hospitals.

**4.** The complaint does not name any co-conspirators as defendants; however, the plaintiff alleges that other hospitals in competition with plaintiff are among the co-conspirators. See complaint, ¶ 17.

The crux of plaintiff's Section 1 claim is that a conspiracy in violation of the Sherman Act exists by virtue of the relationship between Blue Cross and the participating hospitals. Plaintiff contends that Blue Cross's reimbursement policies are controlled by the large participating hospitals and that these hospitals have collectively established a non-competitive reimbursement system. Plaintiff claims defendant has used coercion or boycott to force plaintiff to agree to that reimbursement system.

■ Plaintiff claims that the acts of defendant violate the antitrust laws under both a *per se* analysis and under the rule of reason. This Court has previously declined to analyze the case under a *per se* approach. There is nothing in the structure of the reimbursement mechanism discussed below which would justify a finding of a *per se* violation of the Sherman Act. Further, courts that have addressed antitrust complaints involving participation agreements such as this have almost uniformly applied a rule of reason analysis. *See Quality Auto Body, Inc. v. Allstate Insurance Company,* 660 F.2d 1195 (7th Cir.1981), *cert. den.* 455 U.S. 1020, 102 S.Ct. 1717, 72 L.Ed.2d 138 (1982), and cases cited therein. Therefore, this Court will address this case under the rule of reason. This requires a careful analysis of the facts and a description of the reimbursement mechanism as set forth in the participating hospital agreement.

The reimbursement mechanism involves the operation of a three layer structure. There is, first, a 13 member reimbursement committee which recommends any change in reimbursement policy. Five members of this committee are appointed by the Blue Cross Board of Directors from the consumer membership of its Board of Directors; five members are appointed by the Michigan Hospital Association and are hospital administrators; of the remaining three members, one is appointed by the Governor, one by the Majority Leader of the Michigan

Senate, and one by the Speaker of the House of Representatives of the State of Michigan, from lists of nominees supplied by the State Bar Association, the State Association of Certified Public Accountants, the American Association of University Professors, and other similar organizations.

Any change in reimbursement policies must be recommended by an affirmative vote of 8 members of the committee.

That recommendation is then transmitted to the Blue Cross Board of Directors for approval or rejection. That Board consists of 47 members, 27 of whom are consumer representatives, 19 of whom are provider representatives, and one of whom is the President of Blue Cross.

Finally, a change in the reimbursement policy must be ratified by two-thirds of the number of votes cast by the participating hospitals. The participating hospitals' votes are weighted according to the amount of reimbursement received from Blue Cross during the most recent 12 month period.[5]

In support of its allegation that various participating hospitals control the reimbursement system through a horizontal conspiracy, plaintiff relies primarily on a structural conspiracy theory contending that the participating hospitals affect reimbursements because the participating hospital agreement gives them the power to veto any changes in the reimbursement policy. It argues that, although the hospitals cannot affirmatively implement any change in policy, they can block changes. Thus, argues the plaintiff, the large hospitals, which control the greatest block of votes, can maintain the present allegedly noncompetitive system of reimbursement. Glen Eden concludes that Blue Cross has completely relinquished its ability to independently determine the amount of payments to participating hospitals.

Defendants, on the other hand, argue that, since consumer representatives predominate on the Reimbursement Committee

---

**5.** See, for example, the list of the number of votes allowed for each hospital as of September 1, 1977, Jt.App. at 176 85. This shows 226 hospitals participating, a total of 670.6 votes, and no hospital receiving more than 17.9 votes. Every hospital received at least one vote, no matter how small.

and on the Board of Blue Cross, and hospital representatives are a minority on both, and since participating hospitals have only a veto power, the amendment procedure cannot provide a mechanism for control of payments to participating hospitals.

Plaintiff relies heavily on the recent Supreme Court decision in *Arizona v. Maricopa County Medical Society,* —— U.S. ——, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982). In *Maricopa,* the defendants were non-profit foundations composed of medical doctors. The member physicians, by majority vote, set maximum fees limiting the amount that they could recover as payment for services performed for patients insured under the approved insurance plans. These plans obtained foundation approval by agreeing to pay the doctor's charges up to a scheduled amount in return for the doctor's agreement to accept that amount as payment in full. The Court held that these arrangements were *per se* unlawful under the Sherman Act as price fixing agreements.

The Court does not believe that *Maricopa County* supports plaintiff's position. The allegedly anti-competitive reimbursement scheme here differs greatly from the arrangement at issue in *Maricopa.* On its face, the three-tiered structure in the Participating Hospital Agreement requiring approval of the Reimbursement Committee, the majority of whom are consumers, the Blue Cross Board, the majority of whom are consumers, and giving a veto power to more than one-third of the participating hospitals does not demonstrate hospital or provider control of Blue Cross's reimbursement policy. In contrast, the physician-providers in *Maricopa* affirmatively controlled the fees paid by the insurers. In fact, the defendants in *Maricopa* did not deny that they controlled and fixed prices. Rather, they argued that the arrangement was not *per se* illegal because the horizontal agreements fixed maximum prices and had allegedly pro-competitive justifications. The ability of the hospitals in the instant case to veto recommended changes does not, without more, demonstrate concerted action in restraint of trade.

The facts here more closely resemble those in *Human Resource Institute v. Blue Cross,* 498 F.Supp. 63 (E.D.Va.1980). There Human Resource Institute (HRI), a private psychiatric hospital, claimed that Blue Cross of Virginia violated the antitrust laws by refusing to process HRI's claims, reducing coverage, demanding repayment of claims already paid, and defaming HRI. Blue Cross filed numerous affidavits stating that the decision to engage in the challenged acts was made by Blue Cross alone and not pursuant to any conspiracy. HRI was unable to refute these affidavits. Instead it relied on a theory that a conspiracy existed by virtue of the agency relationship between Blue Cross and its member hospitals. The Court rejected this structural conspiracy theory after noting that a majority of Blue Cross's Board was composed of subscribers.

Plaintiff states, however, that it does not rely entirely on the theory that the veto power demonstrates hospital control of the reimbursement mechanism and establishes the requisite concerted action. It contends that the Reimbursement Committee is "substantially influenced" by the hospital representatives and that Blue Cross's Board of Directors, which must approve recommended changes in reimbursement policy, is controlled or influenced by hospitals.

Certainly, if plaintiff could show that, despite the structure, Blue Cross's reimbursement system is actually controlled by hospitals, the conspiracy requirement would be met. For example, in *Virginia Academy of Clinical Psychologists v. Blue Shield,* 624 F.2d 476 (4th Cir.1980), *cert. den.,* 450 U.S. 916, 101 S.Ct. 1360, 67 L.Ed.2d 342 (1981), the court found that Blue Shield plans were combinations of physicians and controlled by physician members. In that case, the plans' by-laws required that a majority of the Board of Directors be physicians and there was evidence in Blue Shield documents and statements tending to show physician control. Similarly, the court in *Human Resource Institute, supra,* acknowledged that subscriber majority on the Blue

Cross Board "does not necessarily preclude the possibility of member hospital control." 498 F.Supp. at 66. In that case, however, the court found that, since the plaintiff was unable to produce any direct evidence of member control, the conspiracy claims could not stand.

The only evidence of actual hospital control plaintiff has submitted, beyond the structural conspiracy theory, is the minutes of a Blue Cross Board of Director's meeting held on September 29, 1977. The records show that a majority of the Directors voting on that day disclosed some interest or affiliation with hospitals.

In answer to plaintiff's production of the minutes of the Board of Directors meeting of September 29, 1977, defendant has produced deposition testimony showing that Blue Cross did not consult with any hospitals, or anyone else, in deciding to terminate the 1969 contract and establish a different method of reimbursement for Glen Eden. Further, Blue Cross argues that there could be no unlawful conspiracy involved in the settlement of the state court action or the expiration of the interim system of reimbursement contained in the settlement contract. The settlement agreement was stipulated to by Glen Eden and expired, by its own terms, on June 30, 1980. Plaintiff has filed no affidavits nor referred to any deposition testimony contradicting these statements.

This Court does not believe that the plaintiff has produced enough evidence to create an issue of material fact that would preclude summary judgment on Count I. Plaintiff has been unable to refute statements showing that Blue Cross's decisions regarding reimbursement for Glen Eden were not the result of a concerted activity. The attendance at the September 1977 meeting does not constitute direct evidence of conspiracy or concerted activity that would support plaintiff's claim that the reimbursement policy is in fact controlled by participating hospitals.

■ Thus, Glen Eden's conspiracy theory is really based solely on the structure of the mechanism for amending the reimbursement scheme. This Court has already held, and reiterates its holding, that the structure of this mechanism does not demonstrate concerted activity because of the three-tier arrangement and the fact that a majority of the members of the Reimbursement Committee and the Board are consumer representatives.

In addition to its theory of hospital control of reimbursement policies, Glen Eden advances other theories to support its argument that the requisite conspiracy exists. Glen Eden contends that Blue Cross's termination of the 1969 contract for the purpose of requiring adherence to a price-fixing scheme and its subsequent imposition of the Participating Hospital Agreement provide the necessary contract, combination, or conspiracy. In effect, Glen Eden is alleging that the provider agreement itself can be viewed as a sort of vertical restraint.

Plaintiff relies on *Albrecht v. The Herald Co.,* 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968) for the proposition that an illegal combination was formed when Glen Eden was forced to sign the allegedly illegal Participating Hospital Agreement. *Albrecht* involved an agreement to set the resale price at which goods would be resold to a third party. The plaintiff, a newspaper carrier for defendant Herald, alleged a combination to fix the price charged to customers. The Court in *Albrecht* found that defendant Herald and two other parties had combined to force the plaintiff to conform to the resale price. In a footnote, the court stated that the plaintiff could have claimed a combination between the Herald and himself as of the day he complied with the suggested price.

■ The Court does not feel that *Albrecht* controls the instant case. *Albrecht* requires more than a unilateral setting of a price or reimbursement formula between a buyer and a seller. It requires some coercive activity or some collaboration with others. *See generally, Barnosky Oils, Inc. v. Union Oil Co. of California,* 665 F.2d 74 (6th Cir.1981).

■ Plaintiff has not suggested any coercive activity that could bring this case within the scope of *Albrecht*. The denial of computer services cannot be characterized as activity to coerce compliance with the allegedly anti-competitive agreement. The computer service is only available to providers that have signed the Participating Hospital Agreement. There is no reason why those services should have been available to Glen Eden before it became a participating hospital. Nor can Blue Cross's refusal to approve plaintiff's proposed new Troy hospital be characterized as the type of coercion necessary under *Albrecht*. Blue Cross has presented deposition testimony that the refusal to certify the Troy facility was based on a mathematical determination of the number of hospital beds in that area. The plaintiff has not produced any evidence refuting that explanation.

■ Nor has plaintiff been able to point to any collaboration that would bring this case within the *Albrecht* rule. Plaintiff cannot allege that Blue Cross collaborated with its member hospitals unless plaintiff can prevail in its claim that the hospitals really control Blue Cross's action, or that Blue Cross conspired with hospitals to impose this contract on Glen Eden. In a deposition, Mr. Kehoe, Blue Cross Vice-President for Provider Affairs, states that Blue Cross did not consult with anyone when it decided to terminate the 1969 contract and implement the Participating Hospital Agreement. Further, Blue Cross has reviewed all of the minutes of meetings from January 1, 1978 through April 25, 1980 of Blue Cross bodies containing hospital representatives. Glen Eden was discussed only twice during this period. On March 6, 1980, the Hospital Relations Committee voted to recommend Glen Eden for participating status. On March 20, 1980, the Board of Directors approved this application.[6] · Thus, submits defendant, there was no collaboration with hospitals to force plaintiff to sign the Participating Hospital Agreement. Plaintiff has submitted no affidavit or deposition testimony refuting defendant's statements.

Therefore, the Court must find that Blue Cross's termination of the 1969 contract and insistance that plaintiff adhere to the terms of the Participating Hospital Agreement were unilateral actions by defendant.

A review of the relevant case law reveals that several courts have considered the legality of provider agreements similar to the one at issue here. The courts have uniformly decided that, absent proof of some boycott or price fixing conspiracy, agreements determining the amount of reimbursement for the provider of services do not constitute vertical restraints of trade under either the rule of reason or a *per se* analysis. *See, e.g., Sausalito Pharmacy, Inc. v. Blue Shield of California*, 544 F.Supp. 230 (N.D.Cal.1981), *aff'd per curiam* 677 F.2d 47 (9th Cir.1982), *Medical Arts Pharmacy of Stamford, Inc. v. Blue Cross & Blue Shield of Connecticut, Inc.*, 675 F.2d 502 (2nd Cir.1982); *Blue Cross & Blue Shield of Michigan, Inc. v. Michigan Association of Psychotherapy Clinics, Inc.*, 1980–2 Trade Cas. (CCH) ¶ 63,351 (E.D.Mich.1980). Cf. *Quality Auto Body Inc. v. Allstate Insurance Co.*, 660 F.2d 1195 (7th Cir.1981) (Insurance Company agreement with auto repair shop setting maximum prices).

Plaintiff also attempts to argue that Blue Cross conspired with the automobile companies and other subscribers to boycott Glen Eden. Without deciding whether the subscribers can, in fact, form the requisite conspiracy, the Court notes that there was no boycott of Glen Eden. Glen Eden asserts that, unless it signed the Participating Agreement, Blue Cross would only reimburse plaintiff at a rate of $15 per day. This, claims plaintiff, would make subscribers less inclined to use Glen Eden services.

■ These actions cannot be characterized as a group boycott. Glen Eden cannot dispute that Blue Cross never refused to deal with it, and Blue Cross's insistance upon certain terms in its contract with plaintiff does not amount to a boycott. *See Quality Auto Body, supra*.

---

**6.** All of these facts are set forth in the affidavit of Deborah Callopy, Jt.App. at 135.

Therefore, for the reasons given, the motion for summary judgment of dismissal as to Count I of the complaint will be granted.

### III

To establish the offense of monopolization under Section 2 of the Sherman Act, plaintiff must show 1) the possession of monopoly power in the relevant market, *and* 2) "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of superior product, business acumen, or historic accident". *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–1704, 16 L.Ed.2d 778 (1966); *D.E. Rogers Associates, Inc. v. Gardner-Denver Co.*, 1981–1 Trade Cas. (C.C.H.) ¶ 64,024 (E.D.Mich.1981).

Glen Eden asserts that Blue Cross possesses monopoly power because it controls approximately 70% of the health care market for eastern Michigan and 64% of the market for the entire State. Blue Cross disputes this definition of the relevant market and contends that the relevant market is defined by hospital revenues derived from Blue Cross. It states that, since only 33% of all hospital patient days are paid for by Blue Cross, there is no monopoly. Glen Eden has conceded the correctness of the 33% figure in its reply memorandum in support of its preliminary injunction motion, where it said, on page 55, "Whereas an average of only 33% of total patients at other participating hospitals are covered by Blue Cross, at Glen Eden the Blue Cross patients constitute 88% of the total."

This Court cannot determine the relevant market in this case based on the unsupported statements of the parties. There has been no clear expert evidence regarding the relevant market, nor any evidence defining the relationship between the health care insurance market and the market for psychiatric services. Nevertheless, plaintiff's claim of monopolization must fail because, even though the relevant market cannot be defined, there is no showing of unlawful acquisition and exercise of monopoly power, if indeed it does exist.

Glen Eden contends that Blue Cross abused its monopoly power by engaging in threats and boycott activities to induce Glen Eden to sign the Participating Hospital Agreement; by refusing to provide access to the computer; and by refusing to participate in the proposed new Troy facility. This Court has already determined that these activities did not amount to a boycott or refusal to deal.

Blue Cross has offered to deal with Glen Eden on the same terms as all other participating hospitals, and since Glen Eden signed and agreed to the Participating Hospital Agreement on October 31, 1980, Blue Cross has in fact been dealing with Glen Eden. Indeed, in its ruling on the motion for preliminary injunction, this Court found that the refusal of Blue Cross to give Glen Eden special treatment did not "suffice as evidence of an attempt to monopolize or eliminate [Glen Eden] from business ..." Jt.App. at 38f.

The antitrust laws do not require a monopolist to accede to each and every demand of its competitors or customers. See, *Berkey Photo Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 281–82 (2d Cir.1979), *cert. den.* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980); *Telex Corp. v. IBM Corp.*, 510 F.2d 894, 927 (10th Cir.1975). As the Court noted in *Daily Press Inc. v. United Press International*, 412 F.2d 126, 135 (6th Cir.1969), *cert. den.* 396 U.S. 990, 90 S.Ct. 480, 24 L.Ed.2d 453 (1969):

> As we pointed out before, our case does not even involve a refusal to deal with plaintiff. UPI was willing to deal with plaintiff on the same basis as its other contract customers. Plaintiff ... wanted a special deal. Failure of UPI to give plaintiff a special deal ... did not operate to create or attempt to create a monopoly.

Further, a monopolist may lawfully refuse to deal so long as the refusal is unilateral and does not extend or maintain the monopolist's market power. *Official Airline Guides Inc. v. F.T.C.*, 630 F.2d 920 (2d Cir.1980), *cert. den.* 450 U.S. 917, 101

S.Ct. 1362, 67 L.Ed.2d 343 (1981). In *Official Airline Guides,* the Court held that a monopolist publisher of airline guides could arbitrarily exclude certain airlines from its guide. While recognizing that the publisher's refusal to deal adversely affected the excluded airlines, the Second Circuit found the conduct to be lawful because the publisher did not compete in the airlines field and thus the publisher's refusal to deal in no way enhanced its monopoly power. The dealings of Blue Cross with Glen Eden here in no way extended or enhanced Blue Cross's purported monopoly power. It is not an actual or potential competitor of Glen Eden, so its failure to give Glen Eden a special deal did not affect its market position in any way.

It therefore is clear that Blue Cross has not unlawfully exercised its purported monopoly power with Glen Eden since Blue Cross has offered to do business with Glen Eden on the same terms as with virtually all other hospitals. It is also clear that Blue Cross's actions with respect to Glen Eden in no way enhanced Blue Cross's purported monopoly power.

Glen Eden also claims that Blue Cross has abused its monopoly power through its involvement with member hospitals in setting pricing policies. It is not clear exactly what plaintiff is claiming. It seems to be arguing that a Section 2 violation exists because it is unlawful for a monopolist to use its monopoly power in one market to destroy competition in another. This position is only tenable if there is some link between Blue Cross and the market for psychiatric services. Thus, Glen Eden can only maintain this claim if it can prove that Blue Cross conspired with, or is in fact controlled by, its member hospitals and that these actions have the purpose or effect of affecting competition in the market for psychiatric services. Since this Court has already ruled that the hospitals' power to veto changes in reimbursement policy does not evidence hospital control of Blue Cross, this claim cannot prevail.

Therefore, for all of the reasons given, it appears that there is no basis for this case to proceed on the monopolization claim under Section 2. Therefore, the motion for summary judgment of dismissal as to Count II of the complaint will be granted.

There remains Counts III and IV, which are pendent state claims. In view of the fact that the Court has dismissed both Counts I and II, which are the only federal claims, the pendent state claims must fall, and they will also be dismissed.

Therefore, for the reasons given, a judgment dismissing this cause of action and awarding summary judgment to the defendant may be presented. Costs may be taxed.