**ROYAL DRUG COMPANY, INC., etc., et al., Plaintiffs-Appellants,**

v.

**GROUP LIFE AND HEALTH INSURANCE CO., etc., et al., Defendants-Appellees.**

**GROUP LIFE AND HEALTH INSURANCE CO., etc., et al., Plaintiffs-Appellees**

v.

**ROYAL DRUG COMPANY, INC., etc., et al., Defendants-Appellants.**

No. 83–1544.

United States Court of Appeals, Fifth Circuit.

Aug. 6, 1984.

Rehearing Denied Sept. 26, 1984.

---

Tinsman & Houser, Inc., Joel H. Pullen, San Antonio, Tex., for Royal Drugs.

Cox & Smith, Keith E. Kaiser, A. Michael Ferrill, San Antonio, Tex., for Group Life.

Wm. C. Church, Jr., San Antonio, Tex., for Walgreen Texas Co.

Richard P. Corrigan, San Antonio, Tex., for Sommers Drug Store.

Before CLARK, Chief Judge, JOLLY and DAVIS, Circuit Judges.

CLARK, Chief Judge:

Plaintiff pharmacies challenge a prepaid prescription drug insurance program as illegal conduct under section 1 of the Sherman Act. We affirm the district court's grant of summary judgment for defendants.

## I

A group of independent pharmacists in San Antonio, Texas, brought this antitrust action in 1975 against Group Life and Health Insurance Co., known as Blue Shield of Texas (Blue Shield), and three other pharmacies. The complaint alleged that Blue Shield's prepaid prescription drug program violated section 1 of the Sherman Act, 15 U.S.C. § 1, as illegal price fixing, or alternatively as an illegal secondary group boycott of pharmacies that do not participate in the program. Originally, the district court granted summary judgment for defendants, holding the challenged agreements to be exempt from the antitrust laws under the McCarran-Ferguson Act, 15 U.S.C. § 1012(b), because they constituted the "business of insurance." This court reversed, holding that the challenged agreements were not a part of the business of insurance. *Royal Drug Co. v. Group Life & Health Ins. Co.*, 556 F.2d 1375 (5th Cir.1977). The Supreme Court affirmed this court's decision. *Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979).

On remand, the district court granted summary judgment for defendants on the merits, holding that the challenged prepaid drug insurance plans do not violate federal antitrust laws. We affirm.

## II

The Supreme Court described the challenged prepaid drug insurance arrangement thus:

Blue Shield offers insurance policies which entitle the policyholders to obtain prescription drugs. If the pharmacy selected by the insured has entered into a "Pharmacy Agreement" with Blue Shield, and is therefore a participating pharmacy, the insured is required to pay only $2 for every prescription drug. The remainder of the cost is paid directly by Blue Shield to the participating pharmacy. If, on the other hand, the insured selected a pharmacy which has not entered into a Pharmacy Agreement, and is therefore a non-participating pharmacy, he is required to pay the full price charged by the pharmacy. The insured may then obtain reimbursement from Blue Shield for 75% of the difference between that price and $2.

Blue Shield offered to enter into a Pharmacy Agreement with each licensed pharmacy in Texas. Under the Agreement, a participating pharmacy agrees to furnish prescription drugs to Blue Shield's policyholders at $2 for each prescription, and Blue Shield agrees to reimburse the pharmacy for the pharmacy's cost of acquiring the amount of the drug prescribed. Thus, only pharmacies that can afford to distribute prescription

drugs for less than this $2 markup can profitably participate in the plan.

99 S.Ct. at 1072 (footnote omitted).

The original $2 dispensing fee was increased to $2.20 in 1976, and to $3.00 in 1981. There is no allegation or evidence in the record that Blue Shield consulted with pharmacies in setting these fees. The plaintiffs note that this program has achieved great popularity among Blue Shield's insureds. The record does not indicate what portion of total drug sales are made under these arrangements.

### III

The plaintiffs, nine of which participate in Blue Shield pharmacy agreements, argue that these agreements constitute *per se* illegal activity under the Sherman Act as simultaneously horizontal and vertical price-fixing arrangements.

Several federal courts have previously considered the legality of pharmacy agreements virtually identical to those at issue here. *See Medical Arts Pharmacy of Stamford, Inc. v. Blue Cross & Blue Shield of Connecticut, Inc.*, 675 F.2d 502 (2d Cir.1982), *aff'g* 518 F.Supp. 1100 (D.Conn.1981); *Sausalito Pharmacy, Inc. v. Blue Shield of California*, 677 F.2d 47 (9th Cir.), *cert. denied*, 456 U.S. 1016, 103 S.Ct. 376, 74 L.Ed.2d 510 (1982), *aff'g on basis of opinion below*, 544 F.Supp. 230 (N.D.Cal.1981); *Feldman v. Health Care Service Corp.*, 562 F.Supp. 941 (N.D.Ill. 1982). These courts have uniformly upheld these agreements as nonviolative of antitrust laws.[1] We briefly summarize fundamental legal principles discussed at greater length in those cases before addressing the specific contentions by which the plaintiffs seek to put those cases in error.

■ Section 1 of the Sherman Act outlaws "[e]very contract, combination ..., or conspiracy, in restraint of trade among the several States ...." Courts have declared

certain agreements or practices *per se* illegal "which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use ...." *Northern Pacific Ry. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). *See Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 99 S.Ct. 1551, 1557, 60 L.Ed.2d 1 (1979) (activity is *per se* illegal under antitrust laws if "plainly anticompetitive and very likely to be without redeeming virtue"). Activity that is not "manifestly anticompetitive" is analyzed under the rule of reason, which inquires into the unreasonableness of the restraint on competition, looking to "all of the circumstances of the case, including the facts peculiar to the business and the history of, reasons for, and market impact of the restraint ...." *Medical Arts Pharmacy v. Blue Cross & Blue Shield of Connecticut, Inc.*, 675 F.2d at 504.

Price-fixing agreements have been held to be *per se* illegal. *See, e.g., Arizona v. Maricopa County Medical Society*, 457 U.S. 332, 102 S.Ct. 2466, 2472–75, 73 L.Ed.2d 48 (1982). We find, however, that the conduct challenged here falls outside those categories of activity classified as *per se* illegal price fixing.

### A

■ The pharmacy agreements do not constitute a *per se* illegal horizontal combination such as that involved in *United States v. Masonite Corp.*, 316 U.S. 265, 62 S.Ct. 1070, 86 L.Ed. 1461 (1942), because the agreements do not run between competitors in the pharmaceutical industry, nor between competitors in the insurance industry, but between individual pharmacies and Blue Shield, which does not compete

---

1. A state court has held a prescription drug insurance program to be *per se* violative of federal and state antitrust laws. *See Blue Cross of Virginia v. Commonwealth of Virginia*, 211 Va. 180, 176 S.E.2d 439 (1970). The Achilles' heel of that program, which distinguishes it from our case and the other federal cases cited, was the state pharmaceutical association's participation in setting fees. *See id.* at 440–41, 443, 444.

with pharmacies. Nor is there any allegation that Blue Shield has sought the support or advice of the competing pharmacies in establishing the fixed fees. Hence this case is outside the ambit of *Arizona v. Maricopa County Medical Society*, 457 U.S. 332, 102 S.Ct. 2466, 73 L.Ed.2d 48 (medical fee schedules established by foundation composed of medical practitioners constituted *per se* illegal price fixing), and *Blue Cross v. Virginia*, 211 Va. 180, 176 S.E.2d 439 (1970) (Blue Cross pharmaceutical plan that received support of state pharmaceutical society with respect to establishment of fees constituted *per se* illegal price fixing under federal and state antitrust laws). Rather, as *Medical Arts* noted, these pharmacy agreements are "novel restraints with potential procompetitive effects," 675 F.2d at 505. They fall outside established *per se* categories of illegal·activities.

■ The plaintiffs argue that even though Blue Shield does not compete with pharmacies, the uniform contracts entered into separately between competing sellers and a "powerful buyer" nevertheless constitute an illegal horizontal combination. This argument seems to assert the theory of "conscious parallelism," under which a combination among drugstore competitors might be established by circumstantial evidence of parallel conduct among the competitors. "[T]wo elements must be established by a plaintiff relying on a theory of conscious parallelism: (1) that the defendants engaged in consciously parallel action, (2) which was contrary to their economic self-interest so as not to amount to a good faith business judgment." *Pan-Islamic Trade Corp. v. Exxon Corp.*, 632 F.2d 539, 559 (5th Cir.1980). In order to avoid summary judgment under this theory, the plaintiff cannot rely on proof of parallel behavior alone; significant probative evidence of conscious parallelism is required, "with … some 'plus' factor which tends to indicate that the asserted unilateral behavior was not such in fact …." *Paul Kadair, Inc. v. Sony Corp. of America*, 694 F.2d 1017, 1027 n. 27 (5th Cir.1983). The plaintiffs have failed to come forward with

any significant probative evidence that would establish a fact issue as to whether the participating pharmacies did not act according to independent exercises of their respective business judgments to increase drug sales and customer traffic.

Apparently recognizing their failure to satisfy these criteria for "conscious parallelism," the plaintiffs insist that they do not intend to assert a classic conscious parallelism case and don't need to because the evidence of the actual pharmacy agreements negates any need to establish a combination by means of circumstantial evidence. This distinction fails to further plaintiffs' position, for the pharmacy agreements do not run between competitors and hence do not in and of themselves establish a horizontal combination. Such a combination must be established if this sort of attack is to succeed.

In support of their horizontal price fixing theory, the plaintiffs rely on *Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939). In *Interstate Circuit*, a group of motion picture exhibitors demanded, as a condition of their continued exhibition of distributors' films, that the distributors impose minimum price and other restrictions in selling their products for subsequent runs. The distributors' adherence to and participation in the scheme was held to be an unlawful conspiracy under the Sherman Act.

Although *Interstate Circuit* bears a superficial resemblance to the instant case, in that it involves separate contracts between competing sellers and a group of buyers acting as a unit, the Supreme Court's analysis was predicated upon the rule of reason, analyzing the unreasonableness of the restraint in terms of the demonstrated effects on competition and oppressive price maintenance, and not upon the *per se* rule. Our analysis in part IV demonstrates that summary judgment in this case was equally proper under the rule of reason.

**B.**

■ The plaintiffs assert that the pharmacy agreements are *per se* illegal vertical

price fixing. The plaintiffs cite no case, however, to suggest that an insurance company, by engaging in procompetitive conduct in the insurance business, can become a price-fixer in the retail drug business because its method of competition seeks to bring its customers the maximum insurance reimbursement. To support a claim of conspiracy to maintain resale prices, there must be evidence that tends to exclude the possibility that Blue Shield and the pharmacies were acting independently. *See Monsanto Co. v. Spray-Rite Service Corp.*, — U.S. ——, ——, 104 S.Ct. 1464, 1471, 79 L.Ed.2d 775 (1984). The opposing effects of Blue Shield's intermediate interest in minimizing drug-sale reimbursements and of the pharmacies' ultimate interest in earning top dollar tend to indicate that these respective parties were acting independently and without a "conscious commitment to a common scheme designed to achieve an unlawful objective." *Id., quoting Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 111 (3d Cir. 1980).

Moreover, the use of resale price maintenance theory in this instance is unwieldy. Not only are the prices being proposed to sellers rather than by sellers, but also there is no resale transaction in which the price is sought to be maintained. *Accord Medical Arts*, 518 F.Supp. at 1106–07.

The Supreme Court characterized these pharmacy agreements as "merely arrangements for the purchase of goods and services by Blue Shield." *Group Life & Health Ins. v. Royal Drug Co.*, 99 S.Ct. at 1075. Plaintiffs argue that this language was dicta and that the district court and other courts have erred in relying on it to characterize Blue Shield's role in these transactions as that of a "purchaser." Plaintiffs urge in their briefs that whether Blue Shield occupied the status of a "purchaser" of drugs by virtue of the pharmacy agreements is a material issue of fact. At oral argument, however, plaintiffs' counsel

conceded that it is immaterial to this case whether Blue Shield is considered a purchaser or an indemnitor. We agree with this latter assertion. *Accord Medical Arts*, 675 F.2d at 505–06. In either event, Blue Shield and the pharmacies sit on opposite sides of the bargaining table. Absent any evidence of the presence and abuse of monopoly power, Blue Shield has the clear right to bargain for the lowest price and best deal for itself and its customers/insureds.

## IV

The plaintiffs have pled and tried this case as a *per se* case. They have not pled any anticompetitive effect. Assuming without deciding, however, that the complaint can be read to state a claim under the rule of reason,[2] we conclude that summary judgment on a rule of reason claim was equally appropriate. We recently articulated the applicable standard of review in *Walker v. U-Haul Co. of Mississippi*, 734 F.2d 1068, 1070–71 (5th Cir.1984) (footnotes omitted):

Summary judgment is generally disfavored in antitrust cases, which often hinge on issues of motive, intent, and credibility. Nevertheless, we have recognized that a plaintiff may not immunize himself against the entry of summary judgment simply by alleging a violation of the antitrust laws. As in other types of cases, if the pleadings and accompanying evidentiary materials, when viewed in the light most favorable to the non-moving party, raise no "genuine issue as to any material fact," and it appears that the moving party is entitled to judgment as a matter of law, the court may properly enter judgment. Moreover, the party opposing summary judgment may not rely merely on the pleadings or even on conflicting testimony, but must introduce "significant evidence demonstrating the existence of a genuine fact issue."

**2.** *But see Kinnear-Weed Corp. v. Humble Oil & Refining Corp.*, 214 F.2d 891, 894 (5th Cir.1954) ("It is essential that the complaint allege facts from which it can be determined that the conduct charged to be in violation of the antitrust laws was reasonably calculated to prejudice the public interest by unduly restricting the free flow of interstate commerce").

■ In support of a rule of reason claim, plaintiffs offer only a conclusory assertion that the alleged price fixing "eliminates competition." Plaintiffs contend that the defendants have conspired to drive out of business those smaller service-oriented pharmacies that cannot compete for Blue Shield insureds' business without participating in the agreements, yet cannot afford to offer full services under the fees fixed. Even if the complaint be broadly construed to allege predatory pricing or monopoly pricing by an insurer with dominant power in the drug-purchasing market, the plaintiffs' case nevertheless fails under the rule of reason, for they have presented *no evidence* that goes beyond "unsupported conjecture" as to either of these theories, and hence cannot forestall summary judgment. *See id.* at 1072. Moreover, as the district court noted, it is illogical to suppose either that Blue Shield would conspire to reduce competition among pharmacies with which it must deal, or that pharmacies would seek to heighten competition with each other by conspiring to sign the agreements, when each individual pharmacy could readily obtain the full benefits of a pharmacy agreement without concerted action.

## V

As an alternative *per se* theory, plaintiffs contend that defendants have conspired to cause Blue Shield's insureds to boycott nonparticipating pharmacies. Insureds are reimbursed for only 75 percent of their drug purchases at nonparticipating pharmacies, versus one hundred percent at participating pharmacies. Furthermore, insureds who make purchases from nonparticipating pharmacies must individually submit insurance forms to get reimbursed, a burden avoided by shopping at a participating pharmacy. These arrangements, plaintiffs argue, coerce insureds to deal only with participating pharmacies and effect a secondary boycott. We disagree.

■ It is uncontested that Blue Shield derives a fiscal advantage in offering greater benefits to insureds who deal with participating pharmacies. When the insured deals with a nonparticipating pharmacy, Blue Shield must process each insured's reimbursement claim individually. But when insureds deal with a participating pharmacy, the pharmacy agrees to accumulate its charges and submit an aggregate periodic claim for reimbursement of many insureds' prescriptions. Thus, Blue Shield can process the payment for many prescriptions at once. Absent evidence of abuse of monopoly power, competitive bargaining is not *per se* illegal activity. Nor does it become illegal because the bargaining inures to the advantage of Blue Shield's insureds.

■ It is undisputed that Blue Shield has given every pharmacy in Texas the same option to participate in sales of prescriptions to its insureds. There is no evidence that Blue Shield has conspired with other insurance companies. Blue Shield has not attempted to limit the ability of nonparticipating pharmacies to deal with other insurance companies or the general prescription-buying public. It is the competitive, not the exclusionary, effect of its actions that evokes plaintiffs' claim. In these circumstances, defendants' conduct does not constitute an illegal boycott. *Accord Quality Auto Body, Inc. v. Allstate Insurance Co.,* 660 F.2d 1195 (7th Cir.1981), *cert. denied,* 455 U.S. 1020, 102 S.Ct. 1717, 72 L.Ed.2d 138 (1982); *Glen Eden Hospital, Inc. v. Blue Cross & Blue Shield of Michigan, Inc.,* 555 F.Supp. 337, 344 (E.D.Mich.1983).

For these reasons, the district court's judgment is

AFFIRMED.